**In re the Termination of the Parent–Child Relationship of H.G., E.G., and C.D. (Minor Children) and**

**B.G. (Mother), H.H.G. (Father), and C.L.D. (Father), Appellants–Respondents,**

v.

**INDIANA DEPARTMENT OF CHILD SERVICES, Appellee–Petitioner.**

No. 30A01–1103–JT–267.

Court of Appeals of Indiana.

Dec. 14, 2011.

Rehearing Denied Feb. 17, 2012.

Nicole A. Zelin, Greenfield, IN, Attorney for Appellant B.G.

Bonnie K. Wooten, Carthage, IN, Attorney for Appellant C.L.D.

Jeffrey D. McClarnon, Greenfield, IN, Attorney for Appellant H.H.G.

David E. Corey, Robert J. Henke, Indianapolis, IN, Attorneys for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

B.G. ("Mother") has three sons, C.D., H.G., and E.G. C.L.D. is C.D.'s father and Mother's ex-husband. H.H.G. is H.G. and E.G.'s father and Mother's husband. The children were declared children in need of services ("CHINS") due to Mother's and C.L.D.'s incarceration and H.H.G.'s drug use. Ultimately, all three parents had their rights to the children terminated. The record reflects that the children have

a bond with the parents and that the parents have all made progress during the pendency of this case. Although the case manager and court appointed special advocate ("CASA") testified that the children need permanency, the Department of Child Services ("DCS") has not identified any potential permanent home for the children, and termination does not appear to contribute anything to the children's sense of stability. Because the parents appear willing to continue cooperating with DCS and working toward reunification and because there is no indication that allowing the parents more time to do so will harm the children, we conclude that DCS failed to show that termination is in the children's best interest. Therefore, we reverse and remand for further proceedings.

## Facts and Procedural History

About a year prior to the initiation of this case, Mother and C.L.D. stole several items from a house that Mother had been hired to clean, and they fled the state with C.D. According to Mother, she eventually turned herself in. C.L.D. was also arrested and bonded out shortly before this case began. H.H.G. was taking care of all three boys.

On May 21, 2009, DCS received a report that H.H.G. was either "under the influence of a substance or suffering from an unknown medical condition" and was unable to care for the children. Ex. C.D. 3.[1] H.H.G. was unable to converse clearly with the family case manager who responded to the report, and he was taken to the hospital. The hospital ruled out a possible stroke and reported that H.H.G. had tested positive for Xanax. C.D. informed the family case manager that Mother was incarcerated and that C.L.D.'s whereabouts

were unknown. *Id.* C.D. was placed in foster care, and H.G. and E.G. were initially placed with their paternal grandfather. At the time of removal, C.D. was twelve, H.G. was nine, and E.G. was eight.

On May 26, 2009, the trial court approved the filing of petitions alleging that the children were CHINS. The petitions alleged that the parents were unavailable for the reasons already mentioned and further alleged that E.G. and H.G. had frequently been late or absent from school since Mother had been incarcerated. The petitions also alleged that H.H.G. was not employed and had not refilled E.G.'s and H.G.'s prescriptions for ADHD medication. The family case manager ("FCM") reported that the children appeared to have "lost a lot of weight and have dark circles under their eyes; and their hair and fingernails are dirty. [E.G.] has been wearing his brother's clothes which were very big for him." *Id.*

H.H.G. was present for an initial hearing on May 26, 2009, which was continued. The trial court ordered that the children remain in their current placement until further order of the court. DCS's records consistently show that H.G. and E.G. had already been removed from their grandfather on May 22 and placed in foster care. Either this is an error, or DCS failed to apprise H.H.G. and the court of the situation. On June 8, 2009, H.H.G. filed a motion to show cause, alleging that DCS had removed his children from their grandfather "[o]n or about May 27, 2009," in violation of the court's order. Ex. H.G. 13. The same day, DCS filed a motion for change of placement. The motion alleged that H.H.G. had made statements that he was going to take the boys and leave the

---

1. At the termination hearing, DCS labeled each exhibit with the initials of the child it pertains to and a number. Because many of the same or similar documents were filed in all three cases, cited or quoted material often is found in more than one exhibit, but for the sake of simplicity, we will cite only one exhibit.

state, that he had made suicidal statements, that he admitted to taking fifteen Xanax tablets, and that he had tried to contact the children at school. The motion did not state any concerns regarding H.H.G.'s father or his home. Although the court initially set a hearing for H.H.G.'s motion, it appears that the court summarily granted DCS's motion the next day.

Mother was present for initial hearings on June 10 and 17, 2009, and she admitted that the children were CHINS. H.H.G. was present for the June 17 hearing and denied that H.G. and E.G. were CHINS. H.H.G. later filed a motion to intervene in C.D.'s CHINS case, which was granted. The trial court ordered that H.G. and E.G. remain in foster care until a background check of their paternal grandfather could be completed. C.D. was to remain in foster care unless H.H.G.'s father was approved for licensed foster care. C.D. was in a separate foster home, but was able to visit his half-brothers. In its predispositional report filed on July 6, 2009, DCS stated that Mother was in Hamilton County Jail awaiting transfer to Rockville Correctional Facility, and that C.L.D. was scheduled to be tried on criminal charges on July 22. DCS also reported that H.H.G.'s father considered having the boys returned to his care, but then declined for health reasons.

On July 8, 2009, an initial hearing was held for C.L.D., who denied that C.D. was a CHINS. At the next hearing on July 29, 2009, C.L.D. admitted that C.D. was a CHINS. On August 6, 2009, the trial court entered dispositional orders finding all three children to be CHINS, despite the fact that H.H.G. had never been afforded a factfinding hearing. The orders incorrectly recited that H.H.G. and counsel had been present at a dispositional hearing on July 8, 2009; the only proceeding held on that date was C.L.D.'s initial hearing. The orders stated that H.H.G. had "not demonstrated the ability to provide a suitable home or care for the children," that the cousin he lived with had not passed a background check, and that no other suitable relative had come forward. Ex. H.G. 27. H.H.G. was granted supervised visitation of H.G. and E.G. and was ordered to stay away from their residence.

On August 7, 2009, H.H.G. filed a motion to vacate the dispositional orders, which called to the court's attention that he had not been at the July 8 hearing and had not yet been given a factfinding hearing. On August 11, 2009, DCS filed a motion stating that it had prepared the dispositional orders and that "an honest error" was made. Ex. H.G. 29. DCS submitted new orders that omitted findings relating to H.H.G.; however, the new orders still contained conclusions that the children were CHINS.[2] The trial court adopted the new orders on August 18, 2009.

On August 25, 2009, the children's CASA, Rachelle Winter, filed a report in H.G.'s and E.G.'s cases. Winter stated that H.H.G. is "attentive and loving" and that the boys have a bond with him. Ex. H.G. 32. H.H.G. was living with a cousin who had not passed a background check. He was unemployed, but was in the process of applying for disability benefits. H.G. and E.G. both wished to return to

---

2. Our supreme court has held that DCS need not prove "fault" on the part of both parents in order to establish that a child is a CHINS. *In re N.E.*, 919 N.E.2d 102, 106 (Ind.2010). In two recent cases, we have held that *N.E.* does not mean that the admission of one parent that a child is a CHINS deprives the other of a right to a hearing before the child is found to be a CHINS. *In re K.D.*, 942 N.E.2d 894, 900 (Ind.Ct.App.2011); *T.N. v. Ind. Dep't of Child Servs.*, 954 N.E.2d 519, 524 (Ind.Ct.App.2011). Our supreme court has granted transfer in *K.D.* and has not yet ruled on a petition for transfer in *T.N.*

their parents' care, and Winter recommended that the children be returned to H.H.G. once he found suitable housing and had a source of income.

On August 26, 2009, H.H.G. was given a factfinding hearing. At the hearing, the trial court again found H.G. and E.G. to be CHINS, and a formal written order was entered on September 21, 2009. On September 24, 2009, the trial court granted H.H.G. supervised step-parent visitation with C.D. The court characterized H.H.G. as a "father figure" and found that C.D. had "bonded with [H.H.G.] and would like to continue a relationship with him." Ex. C.D. 34. H.H.G. was ordered to remain drug- and alcohol-free as a condition of his visitation with C.D.

On October 7, 2009, the trial court entered dispositional orders for H.G. and E.G. and an order of participation for H.H.G. H.H.G. was ordered to participate in home-based counseling and comply with any recommendations; remain drug-free and submit to random drug tests; complete a drug assessment and comply with any recommendations; attend all visits; secure stable housing, income, and transportation; attend all his medical appointments; sign any releases requested by DCS; remain in contact with the family case manager; and notify DCS of any change in contact information. H.H.G. was granted unsupervised weekend visits with H.G. and E.G.

During the first weekend visit, FCM Katie Huntsman administered a drug test to H.H.G. On October 14, 2009, Huntsman received the results of the drug test, indicating that H.H.G. was positive for cocaine. As a result, DCS filed a motion to suspend unsupervised visits and a petition for rule to show cause. H.H.G. was found in contempt and given a sentence of 180 days, suspended on the condition that he remain drug- and alcohol-free.[3]

On November 16, 2009, DCS filed a progress report in all three CHINS cases. The report indicated that all the children were receiving counseling. C.D. was in contact with a maternal aunt, who was willing to take him in and was in the process of remodeling her home to make room for him. Huntsman reported that "Mother has been in contact with FCM and she is willing to enroll in any classes possible to help with her situation." Ex. C.D. 36. Mother was planning to take a G.E.D. class and then enroll in college classes. C.L.D., who was also incarcerated by this time, also planned to take college classes. Huntsman reported that C.L.D. "has past domestic violence issues that have [affected C.D.] emotionally" and that C.L.D. planned to take an anger management class. Ex. C.D. 36.

As to H.H.G., Huntsman reported that he had completed intensive outpatient treatment for his substance abuse issues and was submitting to random drug screens. H.H.G. was supposed to participate in aftercare, including appointments with a psychiatrist, but he failed to show up for those appointments. H.H.G. claimed that he was unable to pay for aftercare. On June 6, 2009, H.H.G. began

---

3. The nature of this contempt finding is that of civil indirect contempt, that is, willful disobedience of any lawfully entered court order of which the offender has notice. *Henderson v. Henderson*, 919 N.E.2d 1207, 1210 (Ind.Ct.App.2010). The primary objective of a civil contempt proceeding is to coerce action for the benefit of the aggrieved party. *In re Paternity of M.P.M.W.*, 908 N.E.2d 1205, 1209 (Ind.Ct.App.2009). A contempt order which neither coerces compliance with a court order nor compensates the aggrieved party, and does not offer an opportunity for the offender to purge himself may not be imposed in a civil contempt proceeding. *Id.* We note that the sentence imposed on H.H.G. does not appear to be valid.

working with a home-based therapist from Bethany Christian Services on parenting skills, housing, employment, and medical issues. Huntsman characterized H.H.G.'s participation as "very minimal," because he had missed medical appointments, did not seem motivated to look for a job or appropriate housing, and had cancelled some visits, although elsewhere in the report Huntsman stated that H.H.G. had "numerous" visits with H.G. and E.G. Ex. H.G. 45.

On December 29, 2009, DCS filed a motion to transfer C.D. out of foster care to his maternal aunt. Mother and C.L.D. were in favor of this placement, and the motion was granted. A subsequent progress report indicated that the maternal aunt was seeking guardianship of C.D. The FCM further stated:

> [T]he bond this child has with his mother is very great. [C.D.] has made it very clear to this FCM that his relationship with his mother is very important to him and he wants to remain in her life. [C.D.] has spoken with this FCM about his relationship with his father and he has requested to not have face to face contact with his father at this time due to the past violence and abuse he has been subject to when with his father. [C.D.] has stated he would write his father, if his father would ask questions he can respond to.

Ex. C.D. 40.[4] Huntsman also reported that "Mother has remained in close contact with FCM through regular letters. Mother has inquired as to what she needs to do in order to get her children back. Mother has signed all releases asked to sign." *Id.*

On February 23, 2010, DCS filed a progress report in H.G.'s and E.G.'s cases. Huntsman reported that all of H.H.G.'s drug screens had been negative since her last report, although H.H.G. did admit to taking one Xanax pill "for his nerves." Ex. H.G. 50. Huntsman attached records from H.H.G.'s aftercare therapist, which showed that H.H.G. attended three out of three sessions and had not participated in group sessions because there was not a group available. *Id.* The therapist stated that H.H.G.'s prognosis was "[g]ood." *Id.* Attached notes from the visitation supervisor indicate that H.H.G. helped H.G. with homework, played games with the boys, talked to them about their friends and activities, and showed affection. However, H.H.G. struggled with maintaining discipline. Huntsman reported that H.H.G. asked to reduce his visits from twice weekly to once a week due to transportation issues.

Huntsman also reported that H.H.G. was living with a cousin, who had recently been arrested for operating while intoxicated and carrying a handgun without a license. Attached records from the home-based counselor indicate that H.H.G. had trouble finding an affordable apartment due to his credit. The counselor stated that H.H.G. had worked periodically, had submitted some job applications, and was planning to start a flooring business with his cousin. H.H.G. had applied for public assistance and disability benefits, but was denied. Home-based counseling services were closed in November 2009 because the counselor felt that he had completed some objectives and was not following through on the remaining objectives.

Huntsman reported that H.G. and E.G. continued to visit Mother in prison. She indicated that they had "a strong bond with their father and mother and they state that they want to return to live with their father. The children are of a reason-

---

4. Huntsman is the only person involved in this case who mentions C.L.D. abusing C.D. Others only mention C.D. witnessing domestic abuse.

able age to somewhat understand what is happening with this case." *Id.*

On March 19, 2010, C.D. was placed in the same foster home as H.G. and E.G. The reason for transferring him from the care of his aunt to foster care does not appear in the record.

On March 31, 2010, H.H.G. filed a motion requesting unsupervised visitation. After a hearing, the trial court ordered that H.H.G.'s visitation would remain supervised until his housing was approved, which apparently happened sometime in April or May. On June 3, 2010, DCS filed a motion to suspend unsupervised visits, which the trial court granted the same day. In its motion, DCS alleged that H.H.G. had submitted to three drug tests in April and May, and one of them was positive for marijuana.

A few days later, DCS filed a motion requesting that visitation occur outside H.H.G.'s home due to an incident reported by Jessica McKinney, a home-based counselor with Family Works. At the time, H.H.G. was living with his father. On June 9, 2010, McKinney was present in H.H.G.'s home and overheard part of a telephone conversation between H.H.G.'s father and an unidentified female. The female voice said "she would drop off the money from yesterday" and asked if he "had anymore of 'them.'" Ex. H.G. 57. McKinney believed that they were discussing a drug deal and reported the incident to DCS. Upon further investigation, DCS learned that on at least one occasion, H.H.G. had obtained prescriptions on

Mother's behalf from a doctor who had been treating her prior to her incarceration.[5] On June 16, 2010, pursuant to an agreement by the parties, the trial court ordered that H.H.G. have supervised visits outside the home.

On June 23, 2010, DCS filed petitions for involuntary termination of Mother's, C.L.D.'s, and H.H.G.'s parental rights to C.D., H.G., and E.G. On July 21, 2010, DCS filed progress reports in all three cases. The reports indicated that the permanency plan was adoption. Attached documentation from The Villages, a pre-adoptive service, listed the children's foster parents, E.N. and C.N., as the "Adoptive Family." Ex. C.D. at 45. DCS stopped C.D.'s counseling sessions at Gallahue, which were with a female counselor, and C.D. instead was assigned a male mentor through The Villages. The mentor seems to have had a strong, positive impact on C.D. C.D. became more willing to talk about his feelings concerning his family and began expressing a desire to visit C.L.D. Huntsman reported that C.L.D. had completed horticulture vocational classes, anger management classes, and a substance abuse program and was also enrolled in the Inside Out Dads program. Huntsman reported that C.L.D. "cares a lot" about C.D. *Id.*

Huntsman described H.H.G. as "a reliable dad," "easy going," and "sensitive." *Id.* By this time, H.H.G. had been given twenty drug screens, and he tested positive for controlled substances twice (the two occasions already mentioned). H.H.G.

---

5. Mother's medical records show that she has been treated for arthritis and fibromyalgia for several years. Her doctor continued to prescribe Roxicodone, Phenergan, and Xanax for her while she was in jail, and it is apparent from the medical records that the doctor was aware that Mother was in jail and that H.H.G. was taking her medications to her. Mother was transferred to Rockville Correctional Fa-

cility on July 15, 2009, and according to Mother, she did not request or receive prescriptions from her doctor after that time. However, Mother's medical records show that H.H.G. was still in contact with Mother's doctor and that several more prescriptions were written after Mother was transferred to prison.

had told Huntsman that he was working for a landscaping company, but had not yet provided proof of employment. H.H.G. was participating in family counseling sessions with E.G. and H.G. Attached notes from McKinney reflect that H.H.G.'s visits with the boys were mainly appropriate and positive.

Huntsman reported that Mother was enrolled in parenting classes and was awaiting an opportunity to take the G.E.D. test. After getting her G.E.D., Mother planned to take college courses. Huntsman stated that Mother has "a lot of affection and love for her children." *Id.* The report reflects that the boys are bonded with Mother and each other.

The next progress report was filed on December 8, 2010. Attached documentation still indicated that E.N. and C.N. were the anticipated adoptive family. Huntsman stated that C.D.'s CASA "feels that [C.D.] does not want to hurt his mother, father or step-father by agreeing to be adopted by anyone but at the same time does not want to hurt his foster family by not wanting to be adopted."[6] Ex. C.D. 50. C.D.'s mentor described C.D.'s feelings about adoption as follows:

[C.D.] reported being apprehensive about the adoption process at his age. He reported being aware of the option he has to be adopted or not. [C.D.] had questions about the difference between legal guardianship and adoption. This worker explained the difference between guardianship, open adoption and closed adoption. [C.D.] was concerned about a possible name change. This worker told him that in some adoptions the names

may not change; if agreed upon by the adoptive parents. [C.D.] admitted that he did not like to think about adoption a great deal of the time.

*Id.* The mentor stated that C.D. looked forward to visits with Mother. C.D. told his mentor that his first visit with C.L.D. was "o.k.," and that C.L.D. seemed "more genuine" during the second visit. *Id.* Huntsman reported that C.L.D. "has dealt with his anger issues and father skills, he has educated himself more, he has communicated to [C.D.] the mistakes he's made and has taken responsibility of these mistakes in front of [C.D.]" *Id.*

Huntsman reported that Mother "is doing everything she can do while incarcerated to get out and shorten her time, she communicates with her children, she is a good mom, she adores her children and she has enrolled in the [CLIFF] program through IDOC."[7] *Id.*

Huntsman reported that H.H.G. is employed and loves the boys. On October 13, 2010, H.H.G. tested positive for marijuana. He admitted to smoking it because he was struggling with stress. Other than that occasion, H.H.G.'s drug screens were negative. Huntsman reported that H.H.G. "shows up for his visitations, he has gained employment, he is putting in applications, he goes to doctors appointments, he loves his boys and he is communicating with the boys [during family counseling];" however, she felt that he "has a risk for relapse especially with the negative influences in his life." Ex. H.G. 68. Huntsman noted that H.G. is particularly affectionate with H.H.G. McKinney's notes about H.H.G.'s visits indicate that his interactions with the

---

6. If a child is more than fourteen years old, the child must consent to his adoption. Ind. Code § 31–19–9–1. C.D. turned fourteen in 2010.

7. The Department of Correction website indicates that CLIFF is a substance abuse treatment program. *See* http://www.in.gov/idoc/2357.htm (last visited Nov. 14, 2011). The letters stand for Clean Lifestyle is Freedom Forever. *Id.*

boys were mostly positive and appropriate. McKinney's notes show an improvement in H.H.G.'s ability to assume a parental role and maintain discipline, although she did criticize his behavior during a visit that occurred at E.N. and C.N.'s home because he did not help enforce the rules of their home. It is unclear from her notes, however, to what extent H.H.G. was aware of the foster parents' rules or their expectation that he take the primary role in enforcing them.

Huntsman's report contains the following statement concerning the possibility of placing the children with H.H.G.'s mother:[8]

> On 11/5/10 a CFTM [child and family team meeting] was held to address the desire for ... paternal grandmother to be considered for placement of the children. A home check was completed and there were no concerns with her home at that time. After the CFTM was completed, FCM Huntsman staffed positives and negatives with her superiors regarding this change in placement. It was determined at that time to take this request to the permanency team on 12/6/10. FCM Huntsman was informed on 12/6/10 that this is not a decision that the permanency team would need to [be] a part of. Further staffing will be conducted to decide if placement with the grandmother would be appropriate or positive at this time in the case. It was noted that the grandmother was asked to take placement of the children in the beginning of the case but declined at that time.[[9]] She has reported that she did not want to get rid of her dogs at

that time for the children to come live with her and it is reported that if she was told to get rid of her dogs for the children to come live with her now she would not be able to take the children.

Ex. H.G. 68. The record does not reflect that any further action was taken to determine whether placement with the grandmother would be appropriate, nor is there any explanation as to why grandmother's dogs would pose a problem.[10]

The report reflects that E.G. consistently expressed a preference for living with family members. H.G. did not seem interested in talking about his future placement, but initially told Huntsman that he would choose H.H.G. first, then his grandfather, and then a friend. When asked later, he listed friends and E.N. and C.N.

On December 13, 2010, Winter filed reports in all three cases. Winter reported that C.D. is unsure what he thinks about adoption and does not like to think about it. C.D. was supposed to have a visit with C.L.D. on December 5, but when he arrived, he was told that C.L.D. had been transferred to a different facility two days before. Winter indicated that C.D. was disappointed that he was not able to see his father. Winter reported that the boys all enjoy visits with Mother, although H.G. "has a hard time sitting still and showing emotion toward his Mother." Ex. H.G. 72.

On January 24, 2011, Mother wrote a letter to the trial court urging it to place the children with H.H.G.'s mother. On February 23, 2011, Winter filed a report in C.D.'s case. She stated that C.D. has a

---

8. The record is not explicit on this point, but it appears that H.H.G.'s father and mother do not live together.

9. The record contains no information about any previous attempts to place the children with their grandmother.

10. Curiously, the same report indicates that when Huntsman asked E.G. where he would like to live, he listed his grandmother as his first choice because she "has a lot of animals (dogs and a bird) that he wants to live with." Ex. H.G. 68.

strong bond with his Mother and he talks about her often. Winter felt that Mother had not taken responsibility for her criminal offenses and blames others. C.D. told Winter that he has seen Mother steal on several occasions. C.D. also talked about being afraid of C.L.D. because he had witnessed violence between C.L.D. and Mother; he had also seen C.L.D. deal drugs and steal. However, Winter stated that C.L.D. had admitted his mistakes, apologized to C.D., "tried hard to make [C.D.] comfortable" during visits, and had graduated from the Inside Out Dads program. Ex. Vol. VI.[11] Winter reported that C.D. enjoys visits with H.H.G. and that H.H.G. sometimes attends his football games.

On February 24, 2011, Winter filed reports in H.G.'s and E.G.'s cases. She reported that E.G. believes that it is not Mother's fault that she is in prison and that H.G. is angry at C.L.D. because he thinks it is his fault that Mother is in prison. She stated that she has "no doubt that [H.H.G.] loves his children and is bonded with them." *Id.* H.H.G. was involved in the boys' doctor visits, school functions, church, and holiday celebrations. Winter stated that E.G. "always [says] that he wants to be with his Dad." *Id.* She believes that H.G. has a strong bond with H.H.G., but is less affectionate and communicative with Mother.

The termination hearing was held on March 1, 2011. At that time, C.D. was fourteen, H.G. was eleven, and E.G. was nine. Mother testified that she was incarcerated at Rockville Correctional Facility for the burglary that she committed with C.L.D.[12] While incarcerated, Mother had participated in counseling, Mothers Against Methamphetamine, and a domestic violence program. She also completed parenting classes. According to the DOC, her earliest release date is July 13, 2013. Mother testified that she had completed the CLIFF program, an eight-month drug rehabilitation program. She earned a six-month time cut, which had not yet been credited to her; when she receives the credit, her release date will be January 13, 2013. She was awaiting an opportunity to take the GED test because the DOC would not allow her to work on two time cuts at once. If she gets her GED, her release date will be July 13, 2012. A community transition program could move her release date to January 2012. After release, Mother will be on probation for four years.

Mother testified that she writes the children letters every week. She countered Winter's report that she had not taken responsibility for her actions, claiming that she had written each child a letter saying that she had made a mistake and was sorry. She stated that before she was incarcerated, she was a "football mom" and a volunteer at the children's school. Tr. at 77. She described H.H.G. as a "very loving" father. *Id.* at 80. She acknowledged that H.H.G. occasionally uses drugs, but sometimes went "a couple years" without doing drugs. *Id.* at 71.

C.L.D. testified that he was incarcerated at Branchville Correctional Facility. He is currently incarcerated for the burglary

---

**11.** Winter filed a report in each child's case in the month of February 2011. These were not individually labeled as exhibits, but appear in Volume VI of the exhibits after Mother's medical records. Mother's medical records are labeled "H.G., E.G. 4," but so are some of H.H.G.'s criminal records, which are located in Volume V.

**12.** Mother's criminal record also includes four misdemeanor convictions: possession of a switchblade, conversion, and two convictions for driving while suspended. Mother violated probation twice, by abusing benzodiazepines and by committing a new offense.

that he committed with Mother, three class C felony convictions for auto theft, and a class B misdemeanor conviction for failing to stop after an accident.[13] He also has a conviction for driving while suspended, for which he was fined.

C.L.D.'s earliest release date is December 17, 2013. He received a ninety-day credit for completing vocational horticulture classes. He also completed the Thinking for a Change, Inside Out Dads, and Mothers Against Methamphetamines programs. He did not receive any reduction in time for these programs; he participated voluntarily to improve his parenting skills. He has started the PLUS program, which he described as a "character based program" involving classes and community service.[14] Id. at 98. He is also enrolled in a housekeeping apprenticeship. He will be eligible for a six-month credit when he finishes each program. He has also applied to take college courses in "applied science of ... heating and air," but he does not anticipate receiving credit time because he will not be incarcerated long enough to finish. Id. at 101. He believes that he will be released in December 2012 once he has earned all available credits. He plans to live with an aunt when released, and a friend is helping him look for jobs.

C.L.D. testified that he started writing letters to C.D. when C.D. indicated that he did not want to visit. C.L.D. acknowledged that his first visit with C.D. was "tough" because it had been "a long time" since they had seen each other. Id. at 103. C.L.D. admitted that he had spent "a good portion" of his life and C.D.'s in prison. Id. at 95. C.L.D. thought that the visits have improved over time. He testified that he had admitted his mistakes to C.D. and also apologized in court. He stated that he was prescribed hydrocodone after a surgery in 2007 and admitted that he has abused hydrocodone, marijuana, and Xanax in the past. C.L.D. felt that he had learned a lot from the classes he has taken, and stated that he wanted to teach C.D. not to make the same mistakes that he had.

H.H.G. stated that he was evicted after the children were removed. After he was evicted, he lived with a cousin and then with his father. H.H.G. testified that he had worked for eight years as a mechanic, but lost that job about six months before the children's removal. Since then, he has had part-time jobs, "but nothing really permanent." Id. at 123. In July 2009, he started working for a landscaping company, where his hours ranged from five to forty hours a week. He also did work installing flooring about once a week to supplement his income. He obtained a full-time job as a mechanic about three weeks before the termination hearing. H.H.G. testified that finding a job was a "[b]ig struggle.... The whole time I was always looking for a decent job for a full time job.... I got a few but they didn't

13. Exhibit C.D. 59 is a printout from the Indiana Offender Database Search, which is maintained by the Department of Correction. DCS apparently intended to search for C.L.D., but input C.G. (C.L.D.'s first name and H.H.G.'s last name) instead. A search of this website for the correct first and last name returns two people named C.L.D., one with a birth date that matches other records admitted in this case. See http://www.in.gov/apps/indcorrection/ofs/ofs (last visited Nov. 15, 2011). That entry shows that C.L.D. is currently incarcerated for burglary, failure to stop after an accident, and three convictions for auto theft. Id.

14. According to the Department of Correction website, PLUS stands for Purposeful Living Units Serve. See http://www.in.gov/idoc/2356.htm (last visited Nov. 15, 2011). It is described as "a faith and character-based re-entry initiative." Id.

hire me because of my background and my driving record or just whatever." *Id.* at 157.[15]

H.H.G. admitted that he picked up prescriptions from Mother's doctor after she was incarcerated; however, he pled the Fifth Amendment when asked further questions about the situation. H.H.G. stated that he has had a problem with drugs "[p]retty much all my life." *Id.* at 143. He has been through four or five drug treatment programs.

H.H.G. felt that he had a strong bond with his sons and that C.D. was "just like my son." *Id.* at 154. He testified that he has been involved in C.D.'s life since he was six months old. H.H.G. felt that he had grown as a parent. He also believed that the children had a strong bond with Mother.

Huntsman testified that the turning point for C.D. and C.L.D.'s relationship came after C.D. was assigned a male mentor. She felt that the first visit

> was a good ice breaker meeting. There was a lot of information passed as far as ... mistakes were made, Father owned up to his responsibility and why he was there. He let [C.D.] know that ... it was not his fault for being where he was. Dad apologized to him for past mistakes that he'd made and then he just kind of led into what he had been doing since he'd been in prison as far as classes and things.

*Id.* at 221. Huntsman said the second visit was "very positive." *Id.* at 222. The third scheduled visit was the one that had to be cancelled due to C.L.D.'s transfer to a different facility. Huntsman stated that C.D. had been "really excited" on the way to the visit and was "disappointed" when he learned that he would not be able to see his father. *Id.* at 223–24. C.D. has told her that he does not want to consent to an adoption. She acknowledged that if parental rights are terminated and he does not consent to an adoption, he would remain in foster care until he "age[s] out of the system" at age eighteen. *Id.* at 242.

Huntsman testified that she did not have a reason to believe that C.L.D. would be unable to provide a stable home for C.D. when released from prison. She stated that a parent's efforts made while incarcerated would be "acknowledged" but not taken "into [DCS's] final recommendation." *Id.* at 227.

Huntsman testified that H.H.G. had participated in home-based counseling and complied with most of the recommendations. She also stated that he completed a drug assessment and complied with the recommendations. She testified that H.H.G. "remains clean for some time and then will use ... sporadically." *Id.* at 191. She indicated that she did not believe that H.H.G. was currently using drugs, and she had no proof otherwise. She testified that H.H.G. "just actually brought me a paystub today for the first job that he's been able to show me that, he has had part time jobs but stable, I have not seen stable employment at this time." *Id.* at 185.

Huntsman testified that she was not able to place the children with H.H.G. when he was living with his cousin because his cousin did not pass a background

---

15. H.H.G.'s criminal record includes seven misdemeanor convictions: operating while intoxicated, possession of marijuana, possession of paraphernalia, interference with reporting a crime, domestic battery, and two convictions for driving while suspended. H.H.G. violated probation on two separate occasions, by committing a new offense and using Xanax in an amount greater than he was prescribed. Mother was the victim of the domestic battery, although she did not want to press charges and asked the court to lift the no-contact order that was issued in that case.

check. Huntsman denied being aware of whether a home study had been completed for possible placement of the children with H.H.G.'s mother. When Mother's attorney attempted to question her further on the issue, DCS objected on relevancy grounds. DCS argued that the children's placement was relevant only to the CHINS proceedings and not the termination proceedings. Mother's attorney responded that the information was relevant to the issue of whether DCS had a satisfactory plan for the children's care and whether permanency could be provided without resorting to termination. The trial court sustained DCS's objection.

Huntsman testified that she believed that termination was in the children's best interest because they need "stability and permanence." *Id.* at 198. She felt that continuation of the parent-child relationship was a threat to the children's well-being because "no progress" had been made.[16] *Id.* at 197. She acknowledged

---

16. Huntsman's opinion that "no progress" was made is not supported by the evidence. We note that several findings in the termination orders take a similarly overstated tone or are inaccurate. For example:

- Each of the orders states that the children's placements were *all* made *after* court approval. That is plainly incorrect.
- Paragraph 36 of the order regarding C.D. mentions H.G. instead of C.D.
- Paragraph 21 of C.D.'s order states: "While [C.D.] has been in three separate placements, he has done well in his time outside of his parents' care and control. These placements have met all of his needs, something that neither parent has been able to do. Significantly, [C.D.'s] grades are exceptionally better than when he was first removed; he is participating in sports and extracurricular activities; and he is receiving his required medication for his ADHD." Mother's App. at 24. Paragraph 12 also states that C.D. was out of medication for ADHD. We note that the DCS progress report from June 8, 2010, attributes C.D.'s poor grades to multiple changes in schools. According to Mother's testimony, she was a "football mom" before she was incarcerated, and there is nothing in the record to suggest that participation in football is an "improvement" that occurred after removal. Tr. at 77. Finally, we have found no evidence in the record that C.D. was diagnosed with, taking medication for, or showing signs of ADHD prior to removal.
- Paragraph 21 of H.G.'s order states: "[H.G.] has some special needs.... It was originally suspected that [H.G.] has some form of autism; however, after being tested at Riley Children's Hospital, he was diagnosed with reactive attachment disorder. He receives counseling in the foster home to deal with this issue. He also attends family counseling with his siblings and [H.H.G.] While [H.G.] has been in three separate placements, he has done well in his time outside of his parents' care and control. These placements have met all of his needs, something that neither parent has been able to do." Mother's App. at 57–58. One of the original allegations at the time of removal was that H.H.G. allowed H.G.'s and E.G.'s ADHD medications to run out. It is unclear from the record before us whether any proof of this was elicited at any stage of these proceedings. Nor is there any indication that H.G. showed signs of reactive attachment disorder or autism prior to removal. Early reports reflected that H.G. had a bond with both parents; it was not until later that the reports began to indicate that H.G. was not displaying emotion.
- Paragraph 21 of E.G.'s order states: "[E.G.] has some special needs. He has asthma and needs to see a respiratory therapist, which was not taking place while in [H.H.G.'s] care. He was diagnosed with a mild form of cerebral palsy. He currently wears leg braces at night; however, if these do not work, he may require surgery. He also attends family counseling with his siblings and [H.H.G.] While [E.G.] has been in three separate placements, he has done well in his time outside of his parents' care and control. These placements have met all of his needs, something that neither parent has been able to do. He has been diagnosed to rule out the suspected autism, and he

that the boys love H.H.G. "very much" and that termination would "have somewhat of a negative effect on them." *Id.* at 216.

McKinney began supervising visits in May 2010. She testified that H.H.G. tended to act like the children's "peer" and had difficulty maintaining discipline, especially when the visits took place in the foster parents' home. *Id.* at 256. She stated, "I do think he's trying. I think that . . . there are probably multiple factors with regard to things that are hurdles for him," such as employment, transportation, health care, and housing. *Id.* at 262. She was not aware of any dangers to the children, and she felt that the children have a bond with him.

Winter acknowledged that the only concern she reported regarding Mother and C.L.D. was their incarceration. She indi-

cated that C.D.'s visits with C.L.D. had improved over time, and she felt that it "meant something" to C.D. when C.L.D. took responsibility for his actions. *Id.* at 296. She felt that H.H.G. has had a "lack of motivation," but had been more motivated in recent months. *Id.* at 278. She stated, "I think he had a support system that was lacking prior to that." *Id.* She testified that H.H.G. has been involved with the children's doctor appointments, school events, football games, and 4–H activities. Winter expressed concern about the possibility of H.H.G. relapsing into drug use.

Winter initially testified that the conditions that led to the children's removal would not be remedied. However, on cross-examination counsel for H.H.G.

is receiving his ADHD medicine, something that H.H.G. had let run out prior to DCS removing the child on May 21, 2009." Mother's App. at 38–39. Huntsman's reports state that E.G. was prescribed medication for ADHD and that H.H.G. had allowed the medication to run out. He was reassessed after removal, and it was determined that he did not need ADHD medication. We have found nothing in the record to indicate that there was ever any concern that E.G. was autistic. Nor is there any evidence that E.G. was diagnosed with or showed signs of asthma or cerebral palsy prior to removal.

• Paragraph 43 of H.G.'s and E.G.'s orders state: "Jessica McKinney . . . indicated that [H.H.G.'s] role in his children's lives is not one of parent, but of a peer/play[mate]. . . . The only time she has seen him act like a parent was the week before the fact finding hearing. McKinney never saw him make any progress in working on the goals she determined he needed to work on to fulfill his parenting role. . . ." Mother's App. at 46–47, 65–66. McKinney testified that she initially was supposed to provide home-based counseling for H.H.G., but after she reported his father's alleged drug deal, the therapy relationship became uncomfortable, and

she ceased to serve in that role. The record does not support an implication that it is H.H.G.'s fault that home-based counseling with McKinney ended before all goals were met. McKinney continued to act as a visitation supervisor, and her reports explicitly note improvement as early as August 2010, much more than a week before the termination hearing. This finding is based on a statement made by McKinney when discussing visits that occurred in the foster parents' home and is taken out of context.

We note that DCS filed proposed termination orders in this case. Because DCS's original proposed orders have not been included in the record, it is unclear to what extent the trial court edited the orders. Although trial courts are not prohibited from adopting a party's proposed order even when no changes are made, the adoption of a party's proposed order with little or no editing weakens our confidence that the findings are the result of considered judgment by the trial court. *Parks v. Delaware County DCS*, 862 N.E.2d 1275, 1278 (Ind.Ct.App.2007). While the trial court is ultimately responsible for the correctness of its orders, *id.*, we note that the value of submitting proposed orders is greatly diminished if the parties do not take care to craft findings that are based on a reasonable interpretation of the record.

asked, "With the improvements made is it fair to say that they will not be remedied?" *Id.* at 293. She responded, "I can't say that." *Id.* Winter testified that she believed the parent-child relationship posed a threat to the children because "they need permanency, stability." *Id.* at 286. She felt that the lack of stability made it difficult for the children to trust people. She also opined that termination was in the best interests of the children. However, she acknowledged that C.D. and E.G. have bonds with their parents. She testified that the only person that H.G. shows emotion to is H.H.G. and that termination would be "devastating" to him. *Id.* at 290. She also thought that it would harm the children if they are separated.

H.H.G. called his mother to testify. She stated that a home study had been completed so that she could be considered as a placement for the children. When counsel for H.H.G. attempted to question her further on the issue, DCS objected, again arguing that the children's placement was relevant only to the CHINS proceedings. Counsel for H.H.G. argued that it was relevant to whether DCS had a satisfactory plan for the children. The trial court ruled as follows:

> Here's the way I'll handle it because … now that we're ahead of schedule I would like to finish in one day as opposed to flipping over and coming back tomorrow. … I will overrule the objection, allow her to answer then do research before I … make a ruling and … if it's such that my research indicates that I should have sustained the objection … then I will grant [DCS's] motion to strike.

*Id.* at 306.

Perhaps misunderstanding the court's ruling, counsel for H.H.G. withdrew his question and began questioning the witness about her observations of H.H.G.'s parenting skills. H.H.G.'s mother testified that he loves his children, disciplines them appropriately, and has "grown quite a bit." *Id.* at 307. She also stated that he had worked hard to find a job. Counsel for C.L.D. started to question the witness about her willingness to care for the children, but then stated, "Oh, no, I'll withdraw that because we're not going into that. Never mind." *Id.* at 309. On examination by Mother's counsel, the witness stated that she thought that Mother was "a good Mother" and needed "a second chance." *Id.* at 313.

At the conclusion of the hearing, the trial court took the cases under advisement. On March 10, 2011, DCS removed the children from E.N. and C.N. and placed them with a different foster family. This sparked a flurry of filings. On March 13, 2011, H.H.G. filed a motion requesting the trial court to stay its decision and grant a hearing. Mother and C.L.D. joined in this motion. On March 15, 2011, DCS filed an objection to the parents' motion, again arguing that the children's placement was not relevant to the termination proceedings. DCS also filed a notice of change of placement.

The notice of change of placement included a report written by Huntsman. Huntsman stated that DCS received a licensing complaint against E.N. on February 24, 2011. The complaint alleged that E.N. "beat the family dog in front of [C.D. and a biological child]. It was reported that [E.N.] cusses and yells at the children but there were no known allegation of any physical abuse of the children by [E.N.]" Mother's App. at 91. The report was referred to a licensing specialist. On March 8, 2011, the licensing specialist contacted E.N. and C.N. to schedule a meeting.

The following day, DCS received a second licensing complaint. This complaint alleged that C.D. had overheard an argu-

ment between E.N. and C.N. in which E.N. made several upsetting and insulting statements about the children. Huntsman met with the children and the foster parents that same day. The foster parents denied that E.N. had made the statements that he was accused of making. The boys all stated that they were afraid of E.N.'s temper, that he cusses and yells a lot, and that they would rather move to another foster home than be adopted by E.N. and C.N.

On March 17, 2011, the trial court granted DCS's motions and denied the parents'. On March 21, 2011, C.L.D. filed a motion requesting that Huntsman's report be made part of the record, and DCS objected.

The following day, the trial court denied C.L.D.'s motion and issued orders terminating each parent's rights to the children. In each order, the court found that DCS had proven by clear and convincing evidence that the child had been removed for a period of more than six months pursuant to a dispositional decree, that there is a reasonable probability that the conditions that resulted in the child's removal will not be remedied, that continuation of the parent-child relationship poses a threat to the child's well-being, that termination is in the child's best interests, and that DCS has a satisfactory plan for the child's care. In support, the trial court discussed each parent's criminal record, which it characterized as "extensive." Mother's App. at 27, 28, 43. The court noted that Mother's scheduled release date is July 13, 2013, and C.L.D.'s is December 17, 2013. The court declined to consider the potential time cuts testified to by Mother and C.L.D. The court also noted that Mother would be on probation after her release, and that based on her record, she was likely to violate her probation. The court discussed H.H.G.'s drug use and McKin-

ney's testimony about his difficulty in maintaining discipline. The court noted that both Huntsman and Winter testified in favor of termination, and that the children's special needs had been met since their removal. All three parents have appealed.

## Discussion and Decision

▮▮▮ The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 147 (Ind.2005) (citing *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925)). A parent's interest in the care, custody, and control of his or her children is "perhaps the oldest of the fundamental liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Indeed, the parent-child relationship is "one of the most valued relationships in our culture." *Neal v. DeKalb County Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind.2003). However, parental rights are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. *Bester*, 839 N.E.2d at 147. Thus, "[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities." *In re D.D.*, 804 N.E.2d 258, 265 (Ind.Ct.App.2004), *trans. denied.*

Indiana Code Section 31–35–2–4(b)(2) requires that a petition to terminate a parent-child relationship involving a CHINS must allege:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months

under a dispositional decree.[17]

(ii) A court has entered a finding under IC 31–34–21–5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;[18]

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

■ The State must prove each of these elements by clear and convincing evidence.

*Bester*, 839 N.E.2d at 148. In other words, if the State fails to prove any one of these four statutory elements, then it is not entitled to a judgment terminating parental rights. *Angela B. v. Lake County Dep't of Child Servs.*, 888 N.E.2d 231, 239 (Ind.Ct.App.2008), *trans. denied.*

■ When reviewing a trial court's findings of fact and conclusions thereon, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Bester*, 839 N.E.2d at 147. We do not reweigh the evidence or judge witness credibility. *Id.* We consider only the evidence and reasonable inferences favorable to the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is "clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re Matter of R.J.*, 829 N.E.2d 1032, 1035 (Ind.Ct.App.2005).

■ The parents challenge the trial court's findings and conclusions concerning subsections (B), (C), and (D) of the statute.[19] We conclude that the evidence does not support the trial court's conclusion that termination is in the children's best interest; therefore, we do not address the parents' other arguments. In determining the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to consider the totality of the evidence. *In re J.S.*, 906 N.E.2d

17. The parents do not dispute that this subsection applies.

18. DCS stipulated that the family had no prior involvement with DCS.

19. DCS makes the confusing claim that the parents do not challenge the court's factual findings, and it makes several convoluted

waiver arguments based on this claim. At the same time, DCS repeatedly argues that the parents are asking us to reweigh the evidence. The court's orders do not clearly distinguish between findings of fact and conclusions of law. It is plain from the parents' arguments that they disagree with the court's characterization of the evidence and the ultimate conclusions that it reached in this case.

226, 236 (Ind.Ct.App.2009). "In so doing, the trial court must subordinate the interests of the parent to those of the child." *Id.*

We find this case to be similar to two cases in which our supreme court held that a child's need for permanency did not justify terminating parental rights: *In re G.Y.*, 904 N.E.2d 1257 (Ind.2009) and *In re J.M.*, 908 N.E.2d 191 (Ind.2009). In *G.Y.*, the mother committed dealing in cocaine prior to the child's birth. When the child was about two years old, the mother pled guilty and was sentenced to twelve years with eight executed. The mother made several attempts to place the child with relatives or friends, but the child ultimately ended up in foster care, where he was thriving. The child was able to visit mother while she was incarcerated. Mother was not able to participate in services while incarcerated, but she did take a substance abuse education class, a parenting class, and some college courses. By the time DCS filed a petition to terminate mother's parental rights and the fact-finding hearing was held, mother was scheduled to be released in about two years.

The trial court terminated mother's parental rights, but our supreme court reversed, holding that the evidence did not support the trial court's conclusion that termination was in the child's best interests. Our supreme court rejected DCS's arguments that mother was likely to reoffend, that the child needed permanency, and that the child had a closer relationship with his foster parents than his biological mother. The court noted that mother took classes while incarcerated and "made a good-faith effort to better herself as a person and as a parent." *G.Y.*, 904 N.E.2d at 1262. In addition, mother was working toward earning educational credit time that would allow her to be released earlier. Mother had also testified about programs that would help her find a job and a place to live. Mother had consistent, positive, and appropriate visits with the child, and Mother also maintained contact outside of visits by sending cards, letters, and pictures. Ultimately, the court held:

> We agree with Mother that "there was no evidence presented to show that permanency through adoption would be beneficial to [G.Y.] or that remaining as a foster care ward until he could be reunited with his mother would be harmful to [G.Y.]." This is especially true given the positive steps Mother has taken while incarcerated, her demonstrated commitment and interest in maintaining a parental relationship with G.Y., and her willingness to participate in parenting and other personal improvement programs after her release.

*Id.* at 1265.

In *J.M.*, both parents were convicted of attempted dealing in methamphetamine. The mother was placed on probation and the father was placed in work release, but about two years later, they were arrested again on similar charges. The parents both pled guilty and received partially executed sentences. Due to the parents' incarceration, a CHINS case was opened for their son. While the parents were incarcerated, their son lived with various relatives and foster parents. DCS eventually petitioned to terminate the parents' rights due to their continued incarceration. The trial court denied the petition with the following findings:

> [T]he parents' release dates are to occur soon. They have completed many of the required services under the dispositional decree while incarcerated. They had a relationship with the child prior to their imprisonment and attempted to keep the child in the care of relatives prior to their convictions. Their ability to establish a stable and appropriate life upon

release can be observed and determined within a relatively quick period of time. Thus, the child's need of permanency is not severely prejudiced.

*J.M.*, 908 N.E.2d at 194.

Our supreme court reviewed the record and determined that these findings were supported by the evidence. While incarcerated, the parents participated in drug treatment programs, educational programs, and parenting classes. By the time the case reached oral argument before the supreme court, both parents had secured an early release. Father had an apartment, a job, and transportation, and Mother was participating in a "community transition program." *Id.* at 196. Our supreme court therefore affirmed the trial court's denial of the petition for termination of the parents' rights.

■ We note that *J.M.* is dissimilar from this case in that the parents are arguing for reversal of the trial court's orders, whereas *J.M.* affirmed the trial court's orders—an important fact given our deferential standard of review. Nevertheless, both *G.Y.* and *J.M.* make it clear that, contrary to DCS's argument, the court is not prohibited from considering the possibility of a parent's early release, nor should it disregard a parent's voluntary efforts while in prison.

■ The undisputed evidence shows that Mother was involved throughout the case, participated in family meetings, and, in Huntsman's own words, was "doing everything she can do while incarcerated to get out and shorten her time, she communicates with her children, she is a good mom, she adores her children and she has

enrolled in the [CLIFF] program through IDOC." Ex. C.D. 50. Mother testified that she had participated in counseling, completed parenting classes, participated in the Mothers Against Methamphetamine program, participated in a domestic violence program, completed a drug rehabilitation program, and was awaiting an opportunity to take the G.E.D. test and begin college courses.[20] Mother testified that she had already earned credit that would entitle her to be released on January 13, 2013, and that she could be released as early as January 2012 if she gets her G.E.D. and is able to participate in a community transition program.

Mother visited regularly with the children and sent them letters on a weekly basis. Mother was actively involved in the children's lives before incarceration as well. By all accounts, C.D. and E.G. have a strong bond with mother. There was some evidence that H.G. struggled with paying attention and showing emotion when visiting with Mother, but that appears to be his typical behavior around most people, and despite these problems, the record reflects that he enjoyed visits with his mother. Mother urged the court to consider placing the children with H.H.G.'s mother, but DCS failed to follow through on this opportunity despite successful completion of a home check.

Like the parents in *J.M.* and *G.Y.*, Mother has been cooperative and involved in the children's cases, has a bond with her children, has maintained regular contact with them, has attempted to have the children placed with relatives, has taken advantage of opportunities to improve herself

---

20. Before the termination hearing, the attorneys for Mother and C.L.D. indicated that they wanted to submit documentation of the programs that they had participated in. The court stated that it would not require that as long as DCS did not challenge their testimony. At the end of the hearing, C.L.D.'s attorney brought the issue up again, and the court stated, "Nobody questioned either one of you acting as if they didn't believe you took the classes, so in my notes I show that they took the classes." Tr. at 318.

while incarcerated, and has made every effort to earn an early release. As in *J.M.* and *G.Y.*, her ability to parent can be quickly assessed once she is released. The evidence does not support the trial court's conclusion that termination of Mother's parental rights is in the children's best interests.

■ The undisputed evidence shows that C.L.D. also made efforts to improve himself and secure an early release from prison. He completed anger management classes, vocational horticulture classes, Thinking for a Change, Inside Out Dads, and the Mothers Against Methamphetamines program. At the time of the termination hearing, he was participating in the PLUS program and was enrolled in a housekeeping apprenticeship. He also had plans to take college courses. His current release date is December 17, 2013, but he could be released as early as December 2012. C.L.D. has plans for where he will live once he is released, and he is already looking for jobs.

For much of C.D.'s life, C.L.D. has not had a positive relationship with him. However, C.L.D. made the effort to reach out to C.D. through letters even when C.D. was reluctant to visit. Having a male mentor seems to have sparked a desire in C.D. to give his father another chance. By all accounts, visits between C.D. and C.L.D. were steadily improving. C.L.D. took responsibility for his actions and apologized to C.D., and Winter thought that "meant something" to C.D. Tr. at 296.

Like the parents in *J.M.* and *G.Y.*, Father has been cooperative and involved in C.D.'s case, has worked to improve his parenting skills and his bond with his son, has taken advantage of opportunities to improve himself while in prison, has made significant efforts to obtain an early release, and is already working on securing housing and a job for himself upon release.

His ability to parent can be quickly assessed upon release. The evidence does not support the trial court's conclusion that termination of C.L.D.'s parental rights is in C.D.'s best interests.

■ The record also shows improvements in H.H.G.'s parenting. H.H.G. completed drug treatment, and although there were some isolated instances of drug use during the case, most of his drug screens were negative, and Huntsman did not believe that he was using at the time of the termination hearing. McKinney indicated that H.H.G. initially had difficulty maintaining discipline during visits with the children, but he showed improvement as the case progressed.

H.H.G.'s trouble finding full-time employment appears to have been one of the biggest hurdles to his progress. DCS and other service providers characterized H.H.G. as unmotivated, but none of them explained the basis for this conclusion or elaborated on his attempts to find a job. The only evidence concerning his efforts came from his testimony and his mother's; both testified that he tried hard to find a job. It does not appear that either DCS or the trial court took into account H.H.G.'s obstacles in finding a full-time job such as health problems, lack of reliable transportation, and a sluggish economy. A few weeks before the termination hearing, H.H.G. finally found a full-time job, and he provided proof of employment. Throughout the case, H.H.G. lived in homes that would have been suitable for the boys but for the presence of relatives who could not pass a background check. Now that he is employed full-time, H.H.G. has better prospects for finding appropriate housing.

■ DCS discounts H.H.G.'s recent employment, citing *Prince v. DCS,* 861 N.E.2d 1223, 1230 (Ind.Ct.App.2007), for

the proposition that rehabilitation must occur "during the CHINS process, *prior* to the filing of the petition for termination." *Prince* explained that rehabilitation is the emphasis of CHINS proceedings, while the termination statutes do not *require* the court to give a parent additional time to comply with a participation plan. *Id.* As explained, DCS presented *no* evidence that H.H.G. was voluntarily unemployed. We do not believe that *Prince* requires courts to ignore changed circumstances, particularly when those circumstances are not entirely within the parent's control. *Cf. id.* (affirming termination where mother did not complete any services or obtain sobriety at any point during the CHINS proceedings).

It is undisputed that all the boys have a bond with H.H.G., and he has remained active in their lives. H.G. has a particularly strong bond with H.H.G. that he does not share with anyone else. Even though Winter testified in favor of termination, she admitted that termination of H.G. and H.H.G.'s relationship would be "devastating" to H.G. Tr. at 290. The evidence does not support the trial court's conclusion that termination of H.H.G.'s parental rights is in H.G.'s and E.G.'s best interests.

▮ In support of the court's conclusion that termination is in the children's best interests, DCS points to Huntsman's

and Winter's testimony that the children need stability and permanency. A child's need for stability is of great importance; however, mere invocation of words like "stability" or "permanency" does not suffice to terminate parental rights. In this case, each parent still has work to do before reunification would be possible, but they have each shown willingness to continue working toward reunification, and they clearly have a bond with the children. The parents have all had issues with drug use and run-ins with the law, but they have each made significant efforts at self-improvement. Because no adoptive family has been identified and the children were placed in a new foster home shortly after the termination hearing, there appears to be little harm in allowing the parents to continue working toward reunification. This is especially true in C.D.'s case, as he has expressed an unwillingness to be adopted. As DCS admits, if parental rights are terminated and C.D. refuses to consent to adoption, he will be stuck in the limbo of foster care until he ages out of the system. The record simply does not show that terminating the parents' rights will do anything to increase the children's sense of stability.

▮ Throughout this case, DCS has insisted that the children's placement is relevant only to the CHINS proceedings.[21]

---

**21.** As a corollary to this argument, DCS asserts that it is under no affirmative obligation to disclose information about the children's placements, arguing that the parents should have conducted discovery and/or subpoenaed the foster parents to testify. Huntsman's last two reports filed before the termination hearing included documentation showing that E.N. and C.N. were considered the adoptive family. DCS left the parents, the court, and the children's CASA with the misleading impression that E.N. and C.N. were in the process of adopting the children, when in reality that placement was in jeopardy due to a licensing complaint. The record in this case

also raises the disturbing possibility that DCS intentionally delayed its response to the first licensing complaint in order to leave this misleading impression intact. We note that DCS is legally required to disclose a wide array of information to the court and parties. *See* Ind.Code ch. 31–35–18 (predispositional reports); Ind.Code § 31–34–21–1 (progress reports must be filed every three months after a dispositional decree is entered and at any other time as ordered by the court); Ind.Code ch. 31–34–22 (requiring progress reports to be filed before certain hearings). These reports might be considered akin to mandatory

In support, DCS cites *In re B.M.*, 913 N.E.2d 1283, 1287 (Ind.Ct.App.2009). In that case, the father's sole argument on appeal was that termination was procedurally improper because Indiana Code Section 31–34–6–2 requires DCS to consider placing a CHINS with appropriate family members before any other placement. We noted that this section was part of the CHINS statutory scheme. *In re B.M.*, 913 N.E.2d at 1287. The termination statutes require only that DCS prove that it has a satisfactory plan for the care and treatment of the child. *Id.* (citing Ind. Code § 31–35–2–4(b)(2)(D)). The plan for the child's care was adoption, which is a satisfactory plan. *Id.*

■ We acknowledge that adoption has been held to be a satisfactory plan even in cases where a potential adoptive family has not been identified. *E.g., Lang v. Starke County Office of Family & Children*, 861 N.E.2d 366, 375 (Ind.Ct.App. 2007), *trans. denied.* However, this case highlights how such a plan is not necessarily in a child's best interests. DCS must prove both that its plan is satisfactory and that termination is in the child's best interests. Although it is true that DCS is not required to *prove* anything concerning the adequacy of children's placement, that is not the same as saying that the children's placement is *never relevant* to the facts that it must prove. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than

it would be without the evidence." Ind. Evidence Rule 401. Cases such as *G.Y.* and *J.M.* illustrate that a child's placement may be relevant in termination cases, especially where, as here, DCS relies heavily on a child's need for permanency.

We acknowledge that reversals in termination cases may also cause disruptions to a child's life. However, DCS bore the burden of proving that termination is in the children's best interest, and it failed to do so. Therefore, we reverse and remand for further proceedings.

Reversed and remanded.

BAILEY, J., and MATHIAS, J., concur.

---

discovery, and discovery responses must be supplemented when a party "knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment." Ind. Trial Rule 26(E)(2)(b). We need not resolve today whether DCS technically complied with the law; however, we wish to emphasize that

DCS's actions were not consistent with its purpose and that we do not condone what happened in this case. *See* Ind.Code § 31–10–2–1 (policy and purposes of Title 31 include, inter alia, strengthening family life, removal of children from families only when in the child's best interest, and ensuring fair judicial procedures that protect rights of parents and children).