**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

Jun 28 2013, 7:08 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**WILLIAM W. GOODEN**
Mt. Vernon, Indiana

ATTORNEYS FOR APPELLEE:

**DANIEL JANKOWSKI**
DCS Posey County Local Office
Evansville, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF J.W. (Minor Child) and | ) ) ) ) |
| K.S. (Father), | ) ) |
|      Appellant-Respondent, | ) ) |
|           vs. | )    No.  65A01-1211-JT-535 ) |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) |
|      Appellee-Petitioner. | ) ) |

APPEAL FROM THE POSEY CIRCUIT COURT
The Honorable James M. Redwine, Judge
Cause No. 65C01-1009-JT-167

**June 28, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

When he was three months old, J.W. was removed from his mother's home due to her lack of supervision and the filthy condition of the home. At that time, K.S.'s paternity had not been established, and his whereabouts were unknown. During the child in need of services ("CHINS") case, K.S. ("Father") was in and out of incarceration. During the times that he was not incarcerated, Father did not stay in contact with the Department of Child Services ("DCS"). Nearly two years after the initial removal, paternity was established while Father was incarcerated. Soon thereafter, Father was released on parole. He absconded and was later arrested on new charges. DCS then filed a petition to terminate his parental rights. At the time of the termination hearing, Father was still incarcerated and was scheduled to be released in about seven months.

The trial court terminated Father's parental rights. On appeal, Father challenges the court's conclusions that there was a reasonable probability that the conditions that resulted in the child's removal from and continued placement outside Father's care and custody would not be remedied, that there was a reasonable probability that continuation of the parent-child relationship between Father and the child poses a threat to the child's well-being, and that termination of the parent-child relationship is in the best interests of the child.

We affirm. Father was not available to parent J.W. at the time of his removal, and that condition remained unchanged due to Father's alternating periods of incarceration and disappearance. Alternatively, Father's instability, lack of housing and employment, failure to deal with his mental health and substance abuse problems, and criminal conduct demonstrate

2

that continuation of the parent-child relationship poses a threat to the child's well-being. J.W. has never met his Father and has spent most of his life in a foster home. J.W. is bonded to his foster family, who is willing to adopt J.W. and his half-sister. J.W. is thriving in the stability of his foster family, while Father has done nothing to address his unstable lifestyle. Therefore, we agree with the trial court that termination is in the child's best interests, and we affirm the judgment of the trial court.

**Facts and Procedural History**

J.W. was born on November 13, 2009. As of February 2010, J.W. was living in a shelter with his mother, N.W. ("Mother"), and his half-sister, B.W.[1] On February 24, 2010, shelter staff reported to DCS that they had observed Mother leave J.W. unattended and propped up on a bed with a plastic sack in his hand. His diaper was soaked. Mother's room was filthy, with dirty diapers and bottles of formula lying on the floor. Mother had also been known to yell and curse at B.W. and leave her in her high chair for hours at a time. DCS removed the children from Mother and placed them with a foster family. DCS filed a petition alleging that J.W. was a CHINS because of Mother's refusal or inability to supply him with necessary supervision. The petition also noted that K.S. was J.W.'s alleged father and that K.S.'s whereabouts were unknown. The intake officer's report of preliminary inquiry and investigation indicates that paternity had not been established and that the family case manager ("FCM") attempted to locate Father using online search engines and the white pages. DCS was also aware that Father is required to register as a sex offender, but

---

[1] K.S. is not B.W.'s father.

apparently was not able to determine his whereabouts using the registry.[2]

On February 25, 2010, the court authorized the filing of the CHINS petition. An initial hearing was held for Mother, and she admitted the allegations. The court ordered J.W. to remain in his foster care placement.

On April 12, 2010, Father was arrested in Cook County, Illinois, for "prohibited presence within a school zone by a child sex offender." Petitioner's Exs. 17 and 18. Sometime that month, a detective informed FCM Davita Hubbard that Father was incarcerated in the Cook County Jail. DCS and the Posey County Prosecutor's Office attempted to make arrangements to get a DNA sample from Father while he was at the Cook County Jail, but they were not permitted to do so. On May 11, 2010, Father was sentenced to one year in the Illinois Department of Corrections. The record is unclear as to when Father was released, and DCS lost contact with him.

In August 2010, DCS stopped providing services to Mother, and the trial court approved adoption as the permanency plan. J.W. and his sister were still in the same foster home, and the foster parents were willing to adopt both of them. Various reports filed in the CHINS case reflect that J.W. was in good health, developmentally on target, and bonded with

---

[2] Father is required to register due to a 2002 conviction of class B felony child molesting.

4

his sister and foster family. Mother's parental rights were terminated on December 9, 2010.[3]

The CHINS case remained open, and a court order dated February 14, 2011, reflects that DCS was unable to locate Father at that time. It appears that DCS's next contact with Father was on June 8, 2011, when Hubbard learned that he was incarcerated in the Posey County Jail on a charge of failing to register as a sex offender. According to Hubbard, Father indicated that he was aware of J.W. and had contacted Mother at some point. Mother had wanted Father to help support J.W., but he was not willing or able to do so. Hubbard provided Father with paperwork relating to the CHINS case. On June 14, 2011, Father pled guilty to class D felony failure to register as a sex offender, and on August 9, 2011, he was sentenced to one year in the Department of Correction. On August 11, 2011, at the request of Father's attorney, the court ordered that Father be held at the Posey County Jail pending DNA testing. Father's paternity was established on October 3, 2011.

Father was placed on parole toward the end of 2011 and provided housing in a hotel. In December 2011, Father left the hotel without informing his parole agent, and he was declared delinquent. On January 10, 2012, a new charge of failure to register as a sex offender was filed and a bench warrant was issued. On April 18, 2012, Father was located in Kentucky and arrested on the new charge. Two days later, DCS filed a petition to terminate Father's parental rights. On May 31, 2012, Father pled guilty to the new charge of failure to register as a sex offender, which was enhanced to a class C felony due to his previous

---

[3] We affirmed the termination of Mother's parental rights in *N.W. v. Indiana Department of Child Services*, No. 65A01-1101-JT-7, 2011 WL 4499369 (Ind. Ct. App. Sept. 29, 2011), *trans. denied* (2012). Therefore, Mother does not participate in this appeal.

conviction. On June 27, 2012, he was sentenced to two years in the Department of Correction.

The termination hearing was held on September 5, 2012, and Father appeared telephonically due to his incarceration. DCS offered into evidence chronological case summaries from fifteen different criminal cases in Indiana, as well as documentation of his conviction in Illinois. K.S.'s Indiana convictions include class B felony child molesting, three counts of failure to register as a sex offender, failure to carry identification,[4] illegal consumption of an alcoholic beverage, eight counts of public intoxication, possession of marijuana, two counts of disorderly conduct, three counts of resisting law enforcement, criminal mischief, and trespass.

Arthur Davis testified that he was Father's parole agent from November 2011 to December 2011. Davis testified that he went over the rules of parole with Father. As a sex offender, Father was not allowed to have contact with anyone under the age of eighteen, even with supervision. Father's file included notes from a therapist, who indicated that Father seemed childlike, was difficult to understand, appeared to be regressing, and might have Asperger's syndrome. While on parole, Father called Davis and threatened to commit suicide. Davis and a detective went to Father's hotel room and found that he was attempting to hang himself. Father was taken to a hospital, but was released the same day. At some point, Father had been prescribed several medications for anxiety.

In December 2011, Father moved out of the hotel and did not tell Davis where he was

---

[4] Sex offenders are required to keep valid identification in their possession. Ind. Code § 11-8-8-15.

6

going. Davis checked several shelters and also contacted Father's sister, who "seemed to indicate that this was normal behavior for him. To take off and not tell anybody where he's at." Tr. at 49. Davis picked up Father's personal effects from the hotel room, and found that he had left his medications there. Hotel staff also showed Davis a light bulb that had been taken apart and used to smoke drugs. Davis was unable to locate Father, and he was declared delinquent from parole. Davis last had contact with Father in November 2011. Davis testified that Father never mentioned having a son.

FCM Hubbard testified that she could locate Father only during the times that he was incarcerated. She stated that Father had written her one letter, but when she attempted to respond, he was no longer incarcerated, and she did not know where he was. Other than that letter, Father had never contacted her about the case. Hubbard testified that DCS would have been willing to help him establish paternity earlier in the case.

Hubbard testified that J.W. was doing "very well" in his foster home and responded well to the structure of the home. *Id.* at 61. J.W. was bonded with his sister and his foster family. DCS's plan was for the foster family to adopt J.W. and his sister. Hubbard felt that termination of Father's parental rights was in J.W.'s best interest. Beth Folz, who is the guardian ad litem ("GAL") for J.W. and his sister, also recommended termination of Father's rights and adoption of J.W. by the foster family.

Father testified that he was currently incarcerated at Plainfield Correctional Facility

and his scheduled release date was April 16, 2013.[5] Father stated that his brother was going to help him find a place to live when he is released, but he also stated that he planned to go to the United Caring Shelter. Children can visit there, but are not allowed to live there. DCS asked Father, "Is it your intention to have [J.W.], all the time, at some point?" *Id.* at 40. Father responded, "No. At one point I mean, I would like to, but I mean, I'm hoping it comes down to that. At least visitation though.…" *Id.* at 41.

Father testified that he knew that N.W. had gotten pregnant and he believed that the baby was his, although he also claimed that N.W. told him that he might not be the father because she had been cheating on him. Father acknowledged that he has never met J.W. and did not attempt to establish paternity. He testified that he could not afford to hire an attorney to pursue a paternity action. At the time that J.W. was born, Father was living in a shelter, and after that, he lived on the streets for about six months.

Father testified that he has bipolar disorder and ADHD. At the time of the termination hearing, Father was taking medication, but he stated that he cannot afford his medications when he is not incarcerated. He stated that he received treatment for alcohol abuse in 2005, but it did not help him. He claimed that, for about six months prior to his arrest, he had not drunk any alcohol and was attending AA and NA meetings. He estimated that he had been incarcerated for about 45% of his adult life.

---

[5] Neither party makes any representations regarding whether Father has in fact been released. We note that the sex offender registry and the Department of Correction's offender search both reflect that he is currently incarcerated.

Father claimed that no one had explained the rules of parole to him. He testified that after moving out of the hotel, he stayed in Evansville for a while, and then went to Kentucky in search of a job. He believed that his last job was sometime in 2009, and he held that job for about a month. Prior to that, he had worked at Dairy Queen for six months in 2007.

On October 30, 2012, the trial court issued an order terminating Father's parental rights. The trial court made the following findings:

> [K.S.] thought [J.W.] was his child but never sought to establish paternity. Paternity was established at the instance of and through the offices of the Indiana Department of Child Services.
>
> [K.S.] has never met his son. When he was approached about providing support for [J.W., K.S.] refused to do so or even consider doing so.
>
> [K.S.] is currently incarcerated for failing to register as a sex offender. He is due to be released in April 2013.
>
> When [K.S.] was paroled, before being re-convicted, his Parole Officer, Arthur Davis, went over the rules with [K.S., but K.S.] violated several rules, absconded out of state and attempted suicide. [K.S.] never asked Davis about [J.W.] In fact, Davis was unaware [K.S.] had a child until he became involved in this proceeding. [K.S.] was instructed by Davis to find a job, but [K.S.] never did.
>
> …
>
> Davita Hubbard testified the Indiana Department of Child Services made numerous attempts to locate and keep track of [K.S.] and to keep him notified of court proceedings. However, the only times Indiana Department of Child Services could find [K.S.] were when he was incarcerated.…
>
> The court appointed Guardian Ad Litem, attorney Beth Folz, who recommended that the court terminate [K.S.'s] parental rights.

Appellant's App. at 35-36.

Based on these findings, the court concluded that there was a reasonable probability

9

that the conditions that resulted in the child's removal from and continued placement outside Father's care and custody would not be remedied, that there was a reasonable probability that continuation of the parent-child relationship between Father and the child poses a threat to the child's well-being, and that termination of the parent-child relationship is in the best interests of the child. The trial court terminated Father's parental rights, and Father now appeals.

**Discussion and Decision**

The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005) (citing *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35 (1925)). A parent's interest in the care, custody, and control of his or her children is "perhaps the oldest of the fundamental liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Indeed, the parent-child relationship is "one of the most valued relationships in our culture." *Neal v. DeKalb Cnty. Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003). However, parental rights are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. *Bester*, 839 N.E.2d at 147. Thus, "[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities." *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*.

Indiana Code Section 31-35-2-4(b)(2) requires that a petition to terminate a parent-child relationship involving a CHINS must allege:

(A) that one (1) of the following is true:

> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

> (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

The State must prove each of these elements by clear and convincing evidence. *Bester*, 839 N.E.2d at 148.

Father challenges the trial court's conclusions regarding subsection (b)(2)(B)(i), (b)(2)(B)(ii), and (b)(2)(C). When reviewing a trial court's findings of fact and conclusions thereon, we apply a two-tiered standard of review. First, we determine whether the evidence

supports the findings, and second we determine whether the findings support the judgment. *Bester*, 839 N.E.2d at 147. We do not reweigh the evidence or judge witness credibility. *Id.* We consider only the evidence and reasonable inferences favorable to the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is "clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re R.J.*, 829 N.E.2d 1032, 1035 (Ind. Ct. App. 2005).

## I. Conditions Resulting in Removal

Father argues that the trial court's conclusion that there is a reasonable probability that the conditions resulting in J.W.'s removal or placement outside the home of the parent would not be remedied places him in an "impossible situation," because J.W. was "removed because of the Mother's shortcomings which the Father is unable to correct" and Father "was powerless to change or improve the child's environment while the child resided with his Mother." Appellant's Br. at 8. Father's argument focuses solely on paragraph 5 of the CHINS petition, which detailed Mother's lack of supervision of J.W. and the dirty condition of her living space. However, it is apparent from reading the petition as a whole that J.W. could not be placed with Father because paternity had not been established and his whereabouts were unknown. Thus, while Father was not directly involved in the circumstances that led to J.W.'s placement in foster care, he contributed to the removal by being unavailable to parent the child. *See In re B.D.J.*, 728 N.E.2d 195, 200-01 (Ind. Ct. App. 2000) (in case where child was removed from mother's home, we looked to the reasons

the child were not placed with father and affirmed termination of father's rights because those reasons had not been remedied).

Father remained unavailable to parent J.W. since he was placed in foster care in February 2010. For much of this time, he has been incarcerated. When he was not incarcerated, he did not keep in contact with DCS. As a result, DCS was not able to provide services to Father, and despite DCS's willingness to help Father establish paternity, this was not accomplished until October 2011. During the time that Father was on parole, he was not allowed to have contact with children, even with supervision. By repeatedly going missing, Father not only made himself unavailable to parent, but also subjected himself to additional criminal sanctions due to his failure to register. Father was incarcerated at the time of the termination hearing, and while he thought that his brother would help him find a place to live upon release, Father also acknowledged that he might end up living in a shelter where J.W. would not be allowed to live with him. When asked whether he intended to have J.W. live with him full time at some point, Father equivocated. In sum, Father was unavailable to parent J.W. at the time of his removal, and he remained unavailable to parent throughout the proceedings. This supports the trial court's conclusion that there is a reasonable probability that the conditions resulting in J.W.'s placement outside the home would not be remedied.

## II. Threat to Well-being of Child

Subsection (b)(2)(B) is written in the disjunctive; thus, DCS was required to establish, by clear and convincing evidence, only one of the requirements of subsection (B). *In re I.A.*, 903 N.E.2d 146, 153 (Ind. Ct. App. 2009). Nevertheless, we note that the evidence discussed

13

above also supports a conclusion that continuation of the parent-child relationship poses a threat to the child's well-being. In determining whether the continuation of the parent-child relationship poses a threat to the child's well-being, the trial court need not wait until the child is irreversibly influenced by a deficient lifestyle before terminating the relationship. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). Instead, "[w]hen the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate." *Id.* A parent's habitual pattern of conduct is relevant to determine whether there is a substantial probability of future neglect or deprivation of the child. *In re M.M.*, 733 N.E.2d 6, 13 (Ind. Ct. App. 2000). "A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003).

Throughout J.W.'s life, Father has either been incarcerated or has led an unstable lifestyle. He has worked only sporadically, has been homeless at times, has failed to take medication for his mental health conditions, has attempted suicide, and has abused drugs and alcohol. Father has never supported or even met J.W. Among his numerous criminal offenses, Father has been convicted of child molesting and continues to flout the sex offender registration laws. This evidence supports the trial court's conclusion that there is a reasonable probability that continuation of the parent-child relationship poses a threat to J.W.'s well-being.

### *III. Child's Best Interests*

In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to consider the totality of the evidence. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). In so doing, the trial court must subordinate the interests of the parent to those of the child. *Id*. The recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id*.

Father compares his case to *In re H.G.*, 959 N.E.2d 272 (Ind. Ct. App. 2011), *trans. denied* (2012), in which we reversed the termination of parental rights of an incarcerated father, C.L.D. C.L.D. was due to be released relatively soon, and noting that his ability to parent could be quickly assessed upon release, we held that termination was not in the child's best interests. *Id*. at 292.

*In re H.G.* is distinguishable on several grounds. While incarcerated, C.L.D. remained in contact with DCS and his son and made substantial efforts to improve himself and earn an early release. He completed vocational classes, anger management classes, a substance abuse program, and the Inside Out Dads program. Furthermore, our decision was based in part on the fact that C.L.D.'s son was old enough that his consent was required for adoption. C.L.D.'s son had indicated that he did not want to be adopted; therefore, termination of parental rights would leave him in the limbo of foster care until he reached adulthood. In addition, shortly after the termination hearing, C.L.D.'s son was removed from the foster

family that DCS had hoped would adopt him. In light of C.L.D.'s efforts and the fact that adoption likely would not occur, we concluded that termination of C.L.D.'s parental rights was not in the child's best interests. *Id*. at 292, 294.

By contrast, Father has not had any contact with his son, has not stayed in contact with DCS, and there is no indication that he has made use of his time in or out of incarceration to improve his ability to parent. Furthermore, unlike in *H.G.*, in this case, there is no barrier to adoption. J.W. is a young child, and his consent is not required. He has lived with his foster family since he was just a few months old. J.W. is bonded to his foster family, who is also planning to adopt his sister. Because Father has not taken any steps toward improving his ability to parent, this is not a case where his parenting can be quickly assessed upon his release. For these reasons, we agree with the trial court's conclusion that termination is in J.W.'s best interests. Therefore, we affirm the termination of Father's parental rights.

Affirmed.

ROBB, C.J., and FRIEDLANDER, J., concur.

16