## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 08 2016, 6:34 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Caitlin M. Miller
Hunt, Hassler, Kondras & Miller LLP
Terre Haute, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Donald C. Searing, | March 8, 2016 |
| *Appellant-Petitioner,* | Court of Appeals Case No. 84A05-1506-DR-530 |
| v. | Appeal from the Vigo Superior Court |
| Karen Vivas, | The Honorable John Roach |
| *Appellee-Respondent.* | Trial Court Cause No. 84D01-1407-DR-5999 |

**Bradford, Judge.**

# Case Summary

[1]     Appellant-Petitioner Donald Searing ("Father") appeals the trial court's custody

order awarding primary physical custody of minor child, C.S., to Appellee-

Respondent Karen Vivas ("Mother"). On appeal, Father argues (1) the trial court's findings of fact are not supported by the evidence and (2) the trial court's conclusions of law are unsupported by the findings of fact. Specifically, Father argues that it is in C.S.'s best interest for Father to have primary physical custody and the trial court's conclusion otherwise is clearly erroneous. Mother did not file an appellee's brief. Finding that the trial court's conclusions are not supported by the evidence when reviewed under a prima facie standard, we reverse.

## Facts and Procedural History

Father and Mother met online. Father is from Terre Haute, Indiana and Mother is from Manila, Philippines. In March 2010, Father travelled to the Philippines to marry Mother and lived in the Philippines with Mother for six months before moving back to the United States to work and petition for Mother to immigrate to the States. While Father was in the Philippines, Mother became pregnant. The child, C.S., was born in the Philippines on November 3, 2010 and is a citizen of both the United States and the Philippines. Mother and C.S. came to the United States in June 2012 to live with Father in Terre Haute, Indiana. Mother is a legal permanent resident and is permitted to work in the United States. In the time prior to and after moving to Indiana, Mother took care of C.S. full-time and Father worked to support the family.

[3] On April 9, 2014, Mother and C.S. left for a six-week vacation to visit family in the Philippines. The couple had been fighting prior to the vacation and, two days into the vacation, Father told Mother he wanted a divorce. Father told Mother that he would continue to support her until she found a job and obtained her own apartment but Mother refused. Mother and C.S. were scheduled to return in May but did not return to the United States until August 25, 2014 when Mother's friends offered Mother and C.S. a place to live in Texas. At some point, Mother and C.S. moved to Michigan, where Mother worked for Meijer, until finally settling in California in December 2014. In the year following the parties' separation, Mother travelled with C.S. to the Philippines, Hong Kong, Texas, Michigan, California, Las Vegas, and Singapore. Mother never received consent from Father to travel with C.S. and often did not inform him of when or where she traveled with C.S.

[4] Following their separation, the parties had extensive communication through text and Facebook messages, many of which were entered into evidence. Many of the messages from Mother indicate vindictive behavior against Father and reveal Mother's intent to keep C.S. from speaking to or seeing Father. Mother also exposed C.S. to details about the parties' divorce and frequently disparaged Father to C.S. Mother admitted to thwarting Father's ability to communicate with C.S. and preventing Father from having "meaningful parenting time." Tr. Vol. 4, p. 137.

[5] In November of 2014, Father saw C.S. for the first time since he and Mother left for the Philippines in April. Father became aware that Mother and C.S.

were in Michigan after a Michigan CVS called Father regarding a prescription for C.S. Prior to receiving that call, Father did not know that Mother and C.S. had returned to the United States. That weekend, Father drove to Michigan and spent approximately two hours with C.S. at a mall under Mother's supervision. Father had been unable to speak to C.S. for approximately five months prior to this visit. Mother testified that she would not have told Father of her and C.S.'s location if the CVS had not called Father. Father would not see C.S. again until the trial court ordered parenting time in April of 2015.

[6] In December of 2014, Father purchased Christmas gifts for C.S. and made them available for pick-up at a California Walmart near Mother's residence because Mother would not provide an address where the gifts could be shipped. Mother later told Father to cancel the presents because she could not make the drive to the Walmart in time. After the order had been cancelled, Mother took C.S. to pick up the presents and told C.S. that Father did not get him any presents.

[7] Father filed his petition for dissolution of marriage on July 30, 2014. Summons was issued by international mail to Mother's address in Manila but was returned indicating that Mother had not been served. Father served Mother by publication in November of 2014. The trial court held an initial hearing on December 11, 2014 at which Mother was not present. At the hearing, the trial court dissolved the parties' marriage, split the parties' debts, indicated that custody could not be determined due to Mother's absence, and ordered that Father is entitled to parenting time pursuant to the Indiana parenting time guidelines until custody could be determined.

[8] On January 12, 2015, Mother requested relief from the judgement and a hearing was set. On January 30, 2015, Father requested an initial custody and support determination. On February 20, 2015, the trial court held a scheduling hearing at which Mother was present by telephone. The trial court set a final hearing for May 4, 2015 and ordered that, because "[Father] has only seen [C.S.] for a few hours in the last ten (10) months," Father be permitted to Skype with C.S. every Saturday and that the parties arrange dates during which Father can fly to California to visit C.S. Tr. Vol. 2, p. 7. Mother did not agree to any dates for Father's visitation.

[9] On March 31, 2015, Father filed a motion for emergency hearing and a verified motion for restraining order as to C.S.'s passport. On April 8, 2015, an emergency hearing was held to set dates for Father's visitation. The trial court ordered that Mother would make C.S. available for pick up on April 19, 2015, that Father would pick up C.S. in California on that date and return to Indiana with C.S., and that C.S. would stay with Father until the final hearing on May 4th. The trial court warned Mother that she would be held in contempt if she failed to abide by the order, at which point Mother made the following statement: "Yeah but I am also concerned on how, my staying in Indiana that why I, I really need ah, I refuse to, I absolutely refusing for him to go to have to go to Indiana. Cause I am trying to obtain a petition of my son, suing the visitation of his father over here in California." Tr. Vol. 3, p. 8. The trial court responded by saying "I am going to let you talk to your attorney before you make any more statements about blatantly disregarding an order of this court.

So I suggest you talk to your attorney privately and I am going to disregard the statement that you just made that basically said, you are going to ignore this court's order." *Id.* at 9. Mother ultimately complied with the trial court's order.

[10] The trial court held a hearing on May 4, 2015 to determine custody and settle all other pending issues. Father submitted several exhibits into evidence including pay stubs, money transfer records, and over 600 text and Facebook messages exchanged between the parties. Father submitted a transaction history of his account with a money transfer service which shows that he sent Mother $2200 in April and May of 2014 while Mother and C.S. were in the Philippines. The relevant portions of the parties text communications are as follows:

> April 12, 2014
> Mother: Your [sic passim] the only one I could ask [for] help [with hospital bills][1]….
> Father: Ill help with them no problem.
> …
> Father: Just tell me how much. Is he ok?
> Mother: Hes awake and not puking so I might get him out [tomorrow] if he [don't] have any puking all night. Its up to you and [I'll] just find whatever it is to cover everything. Please talk to [C.S.] when u can hes been calling your name.
> Father: No just tell me how much is needed. When he is out we will skype I wanna see him….Just give me an amount and ill send it I will pay for it. He is my son.
> …

---

[1] It appears that C.S. became ill either prior to leaving for the Philippines or shortly after arriving and was hospitalized. However, the record is unclear regarding the details of C.S.'s affliction.

Mother: Just take [C.S.]. I cant go on much longer. You took my life away. If you want to leave me just take [C.S.] bec[ause] I cant go on.

…

Mother: Just take [C.S.]….You can have everything now. You can have [C.S.].

…

Mother: I need to be on my feet again.
Father: Stay [in the Philippines] till your ticket is up we will work out something to [w]here you can come back if you want to be here.
Mother: And still divorcing me? [I'll] deal with this on my own. [Thank you] though.

…

Father: …I wouldn't leave you with nothing or no where to go.

April 13, 2014
Mother: [C.S.] is crying already wanting to leave but I cant get all the money yet…Im waiting for you to send the money s[o] [C.S.] can go home…Il let you see [C.S.] tonight [please] help our son out I beg you.

…

Father: Where should I send it and what currency?

…

Father: 800 enough?

April 21, 2014
Father: Will I be able to see my son?

…

Mother: [I don't know] yet. [I don't know] what to do with my life.
Father: I told you to come back.
Mother: Im scared.
Father: Why? I will help you. All of us will. I told you [we're] still a family. Just a little farther apart.
Mother: Im too confused
Father: [Please] le[t]s both be there for [C.S.]
Mother: [I don't know] how without me hurting too much. I don't want to fight anymore.
Father: I will help you get on your feet.

…

Mother: Just come home in the apartment we can sleep apart.

Father: You have everything you need in the apartment.
…
Mother: …I wont be able to afford all the bills on my own.
Father: And Ill help make sure you can get there and take care of [C.S.].
…
Mother: If your going to watch [C.S.] it has to be in the [apartment].
…
Father: I will watch him where I can [please] stop trying to demand everything.
Mother: Sorry I cant let him be near her.
Father: I will help you pay [the bills]. I will watch [C.S.] but you cant say exactly where.
Mother: If u cant watch him at home I cant do this.
Father: I will keep him safe and no one will try to replace you I wont allow it.
Mother: Gotta make sure hes not around her.

May 2, 2014
Mother: You can get upset all u want from me wanting to hurt myself but with how you surprised me after I was supposed to be on vacation what do you want me to do?...
Father: Get [C.S] new shoes[.] I remember the conditions you can come back.
Mother: Makis will get him a pair [tomorrow]. [I don't know] yet about coming back. I have one year you know where to find us u can come when u ca[n].  [C.S.] needs to get to a derma soon half his butt has like huge blister already and around that has full of hives. [I'll] take a picture and show you when I change his butt hes cranky bec[ause] he itch a lot.
Father: I can do 100 is that enough?
Mother: Im going to ask anthony [tomorrow] thanks though. Plus [C.S.] has a lot of sun burn his shoulders and back that adds up….I couldn't get a hold of Anth right now so you might need to be the one to take care of [C.S.] to get to a derma and u want to get [C.S.] a new pair of shoes? When did u send us money for food atleast? Makis even got his diapers. Everything went to the hospital but oh well its not your fault.
…
Mother: Hey can we talk? Im up having a belly ache on and off
Father: Yes we can talk I sent money there already

Mother: Im not mad at you and im sorry about my emotions. Hope u understand that at some point its going to be at its peak. Im tired of fighting.

May 3, 2014
Mother: [C.S.] has like blisters on his butt. Then rashes all over his body…We have to go back on Monday for a derma but a pediatrician gave him creams to apply.
…
Mother: We are heading to hongkong on the 9th
Father: Will I be able to call [C.S.] later when I get off so I can talk longer to him today or not?
Mother: Depends what time we can be home but if we are home yeah. But cant assure you he would talk but I will try to convince him for you. And if we come back you promise that you would only come to our place to see [C.S.] and not take him anywhere without me too? Sorry but this is something very important to me if your not going to work us out at all. But I know you said maybe your not sure. We aren't the one who left you I need to make sure of this before we even come back. Or we could just stay here you know where to find us. I have 1 year before they say I abandoned my greencard. If you have a change of heart and decided you want our family you know where we are. I cant promise we will wait for you forever but who knows.
Father: That's fine I guess about the seeing him here part.
Mother: Are you completely giving up on us? So you want us to stay here?

May 28, 2014
Mother: At one point you were always there for me and [C.S.] and at this point our son cries for help im just so useless right now im running to u now the person I trusted our lives and I know you wont turn your back on [C.S.] on us at this point….
Father: How much?
Mother: Whatever you can afford to help him is fine.
Father: is 100 ok?
Mother: Im short 11,400 to do the mri but if that's what only you could afford I don't have much of a choice thank you though.
Father: 150 is the most I can do.
Mother: Im fine in whatever you can do thank you so much for helping. I will pay you back on this one I should get paid on the 31st.

Father: I don't want [sic] paid back

June 7, 2014
Father: I'll be on Skype in 30 min
Mother: [C.S. is] crying a lot now.
Mother: Your making him cry now.
Mother: He's calling you now.
Mother: Its better for you to just leave us alone completely. Your turning [C.S.'s] life upside down. He's too freaking little for this. Right now at his age he will never understand what you have done and how you ruined his life. I tried to see how it'll affect him now. It isn't good. So [please] just completely go away until he can understand. You have done nothing for him since we left to visit anyway. You only got him out of the hospital. That's the only thing you've done. This is the payback for what you have done to us. Sorry but your going to deal with it.

June 10, 2014
Mother: Im sorry but about [C.S.] you seem to not understand how he [i]s everytime he is reminded of you. He would cry nonstop and throw everything he can touch. Its like there is a lot of emotional stress on him everytime he hears about you. I cant force him to talk to you. And no don't accuse me that im telling my son he has no father bec[ause] honestly im running out of excuses to tell him as to why you are not around. [C.S.] is coping up and very much okay until he got reminded of you. You saw him how he act. That is not my fault. He showed you how much he is hurting. Let [C.S.] heal on his own before you try anything. He needs to heal. No Donny, [C.S.] and I are starting a new life we are starting to be happy again. I can say now we can live without you….

June 12, 2014
Father:…I asked you to [please] not [message] me unless about [C.S.] or extremely imp[ortant]. I need that phone back though [please] I don't want to keep paying for it unless you can pay it off and get your own plan.
Mother: …If you want communication with [C.S.] your not taking this phone back. You'll get over it. You want to know? We should be back in the states few days from now….So if you have nothing good to say don't reply to my [messages]. You are just proving you don't deserved any kind of place in our lives.

Father: I have asked that you only [message] me about [C.S.] or something imp[ortant]…And no I want the phone back I do not have to pay for your phone to be able to talk to my son.

…

Mother: You can want all you want but your not going to get them. That's not even enough for the damage you have done. Oh yeah you want to return the damaged screened iphone? Your son threw it bec[ause] you made him f[******] wait. So you pay for all the shit you've done. Make me madder. Try me then. Nothing is going to be your f[******] way.

Mother: Don't [message] me back anymore….Once again I'm going to tell you get out of our lives….[C.S.] is so much better now. I never want my son to grow up seeing a bad example on you. So go away.

Mother: Im blocking your number on here from now on.

August 7, 2014

Mother: As long as im in the Philippines your freaking laws have no jurisdiction on me and [C.S.]….

November 12, 2014

Father: You think not letting me talk to him and have any. relationship with him is helping? No it makes it worse when I finally do get to talk to him.

Mother: I [don't] care what you say anymore just leave us alone.

November 17, 2014

Mother: We need to talk about [C.S.]. Its Karen.

…

Mother: I want you to be in his life [I don't know] how are we going to do it but he needs you.

Mother: He needs you more than anything.

Mother: Im in the process of getting back on my feet I have a job but I need a bit of help with [C.S.] too.

…

Father: I'm going to need [C.S.'s] social. I should have a job. with insurance soon I need it to put him on it. I might need the address to[,] I'll let you know when I find out.

Mother: I'm not letting you claim him on taxes[,] im filing my own and im claiming him on it. For now im not giving his social. I should get my insurance too soon. So I can just put him

on it eventually. I should get my transfer at work soon. Im moving to [California].

November 19, 2014
Mother: You can visit him anytime though….
Father: How can I visit without your address?
Mother: I'll give you my CA address I think we should move after thanksgiving. I'll live 40 minutes away from LAX. Better opportunities in CA….
Mother: Plus delta is a part time so Jon said just quit it….
Father: Let me have him for thanksgiving
…
Mother: My son is not a freaking toy you'll want him when its convenient on you. You can all go to freaking hell.

November 23, 2014
Father: Do me a favor and ask your lawyer about a term called parental kidnapping.
Mother: Oh yes we actually look into that and they explained to me that you cant even charge me of that so screw you bec[ause] I know what I do the day I get back my feet to America.
…
Father: Can I just have him tues weds Thursday I'll bring him back.
Mother: We might fly on weds that the problem.
…
Father: Ok [please] I'm only asking for a few days bec[ause] it's been so long since I got to hug him.
Father: I will never keep him from going anywhere with you bec[ause] I know you have his best interest in mind. I just miss my little boy.
Mother: I'll let you know [tomorrow] [I'll] check if I could get a later flight than [Wednesday].
Mother: Please allow him to be in Manila I have to work two jobs to pay for daycare my paycheck from delta just goes to daycare. In manila he can be a real kid and you know it. He can

heal faster. I cant give up my jobs here in America bec[ause] this is all for our son….

Father: Will he just be there alone and you here?

Father: Bec[ause] that doesn't make much sense to me bec[ause] he can stay with me and you can see him whenever you want. That's not a problem at least then he's still close to you.

Father: I'm not trying to take him away from you don't get the wrong idea I'm just trying to help

Mother: No that wont work [C.S.] is better off in manila for now. He's been asking me for that. He's been telling me get on the plane….I might go back to Manila with [C.S.] in February and see from there….you know how much he can be better in Manila. I just want to get all settled then get him back here but we need to renew his US passport in June….

November 24, 2014

Father: [Please] let me know about me having C.S. for thanksgiving.

Father: Hey you told me you were going to tell me before you went to work and said you had to work early, and I haven't heard from you about it.

November 26, 2014

Mother: Sorry been busy at work I cant let [C.S.] go. Our schedule is tight and I [don't] want to get [C.S.] confused at all. What you want will never be easy on me.

Mother: Give it more time [please] I [don't] want [C.S.] to suffer emotionally too much I know you love him lets do the best for him….His school in Manila emailed me and they were wanting to put [C.S.] in a special program….[C.S.] and I has to go home in February for Mon's wedding and maybe I'll stay there 6 months and let [C.S.] continue his school. I wont ask you to support him anymore….I know you wouldn't hinder anything that would benefit our son I know you'll be proud of him. Believe me im doing my best to be a responsible mom and dad to our son. One day you guys will see each ot[h]er again.  Even if you left us even if you ruined our family….Let him renew his

passport so he can keep going back n forth from manila and the US so theres a chance that he could see you one day when he is ready when he is all healed....

November 29, 2014
Mother: ...You think after what you did I could trust you like that? We might have been married before but you completely broke me and [C.S.]'s trust....Im tired of you bugging me for the things you want to happen right away. I am keeping my son from all the negativity of life. If that includes yourself than my son doesn't need you. Don't even start me on this. You know me better [I'll] fight you all until the very end....
Father: All I wanted was the address. [Because] every time you have said after work you don't do it.
Father: I just want to know where to go to see [C.S.]....
Father: I'm not trying to fight I just need to make the plans today and I can't if I have no address.
Mother: I honestly don't know the exact address I just know we are in Lansing [Michigan]....
Mother: If your coming [please] I don't need the woman your living with to be here or be around [C.S.]. Im avoiding [C.S.] to be around people who has somehow caused this family to break apart. Let him move on completely. Remember he is carrying mostly filipino values now and I prefer that.
Father: [Please] let me know right away
Father: You don't know the number on the house and the street your on?
Mother: No I barely look around we don't go out its too cold and when I get home its late at night
Father: No mail to look at?
Mother: Why cant you wait at all?
Father: Bec[asue] I have to make the plans to get there
Father: I don't have much time to do it I wouldn't be bugging you if I didn't need to.
Mother: Im in bed tryin to go back to freakin sleep I got off at 4 am in the morning then [C.S.] woke up when I get home and I work again today.

Father: I'm sorry.

Mother: Im close to blocking your number its getting annoying your being so demanding when you don't even feed this little boy. [Please] let me sleep some.

Father: I'm not trying to be annoying but you are asking me to do it on the drop of a dime to drive all that way. I did have things going on and I'm cancelling and dropping them all to see him.

Mother: Then don't do it. I am not asking you at all. Im letting you know whats going on and letting you have a chance to see him before we head to SoCal and start a new life. This will not benefit me at all. It wont matter to me if you come or not.

Mother: So don't even tell me what your dropping for him. [C.S.] is definitely going on with his life without even seeing you. [C.S. is] lost. So think before you even utter a damn word!

Mother: You have to promise you'll come without that woman tomorrow. Or I wont let you in….

Father: [I'll] come alone. Are you going to give me the address?

Mother: [I don't know] if you should come I have things to do with [C.S.] tom[orrow] like get him a haircut, new pair of shows and some jeans. [I don't know] if you would wanna go still and see him.

Father: Yeah I wanna go I canceled a training class for my new job to see him.

December 12, 2014

Mother: Can you skype [C.S.] now.

Mother: Hes cryin wanting your face.

Father: Yeah if you want me to hang on let me get on a computer.

Mother: He's ready on it.

Father: Ok.

…

Mother: [C.S.] is wanting to back on skype with you.

December 14, 2014

Father: Ok I will so I'll have your address. Like I have been asking you for.

Mother: Yeah you'll get it it doesn't matter anymore. But the legal battle is about to start.

…

Mother: Having him with me is you losing big time. You cant take back any time you lost anymore and one day [C.S.] will find out what you did.

…

Mother: Sorry but [C.S.] doesn't need a father that tossed him to the curb. A father who only cares for himself.

December 15, 2014

Mother: …[C.S.] keep telling Jon last night…my daddy has a new family I only have you my mommy and the people he is close to us now. At 4 jon is surprised how much knowledge [C.S.] has about the divorce….

Mother: You have lost [C.S.]'s respect on you….[C.S.] doesn't need a father like you.

December 25, 2014

Mother: Remembe[r] my son is a dual citizen you cant revoke his [U.S.] passport alone either even if you revoke it means he can head back home to the philippines and [I'll] give up his [U.S.] citizenship and choose to be 100% Filipino….that way [he] can have the opportunity anywhere else in the world without you being in the way.

December 30, 2014

Mother: There's nowhere you guys can email me anymore.  Im totally done with all of you and now that [C.S.] is going to get our own place im not giving out any info anymore.  Kill me first before you can take [C.S.] around that woman [referring to Father's wife].  Im completely done talking to you….

Petitioner's Ex. 1, 4-7.

[11]    At the time of the final hearing, Father was living in Terre Haute with his new wife and their then-two-month-old son. Father makes $14.36 per hour and works approximately forty hours per week. While living in Michigan, Mother was making $9.57 as a warehouse engineer. At the time of the final hearing, Mother was making $10.00 an hour working approximately thirty hours per week in California. Mother testified that she was received a degree in industrial engineering in the Philippines and worked for Shell Oil Company in Manilla. Mother stated that she is unable to work in the United States as an engineer until she completes certain classes and has her transcripts certified. At the time of the final hearing, Mother had not obtained any such certification.

[12]    On May 27, 2015, the trial court issued the following order:

> 1. The parties met online and decided to pursue a relationship. Petitioner visited respondent at her home in the Philippines for approximately 6 months in 2010. The parties were married and petitioner returned to the States. Several months later, the parties' son, [C.S.], was born on November 10, 2010. Petitioner returned to the Philippines for 1 week to visit his son on his first birthday. That was their first meeting.
>
> 2. Respondent was an engineer in the Philippines having received a degree in Industrial Engineering. She worked for Shell Oil Company in Manilla. Respondent chose to move to the United States with the couples' son to start their family life here. She received permission and moved to the United States in July, 2012 with the couples' son.
>
> 3. From July 2012 to the parties' separation in and around April, 2014, petitioner worked full time, six (6) days per week, twelve hours (12) per day. Respondent stayed home to care for [C.S.]. Respondent is not able to work in the States as an engineer until

she gets her transcripts certified and reviewed. She does not have a driver's license and has not learned how to drive. Petitioner did all the driving during the marriage. This had the effect of isolating respondent in the home.

4. On April 9, 2014, respondent left with her son on vacation to visit family in the Philippines. The couple had been fighting before the vacation. A few days into the vacation, petitioner informed respondent he wanted a divorce.

5. Respondent was supposed to return from vacation in May of 2014. She did not return to the United States until August, 2014. There was communication, sometimes acrimonious, between the parties from April, 2014 through the end of the year when respondent settled in California. In November, 2014, petitioner was able to see his son in Michigan for the first time in about 7 months.

6. By order entered December 11, 2014, the marriage of the parties was dissolved.[2]

7. Mother has custody of the minor child and lives in California. Father, along with his new wife and child, lives in Terre Haute.

8. Divorce under the best of circumstances, especially when children are involved, is difficult at best. Add to the mix that respondent is from another country, from a different culture, and that petitioner chose to reveal his intent to divorce by telephone during his wife's vacation out of the country, and you have the perfect recipe for the disaster which befell this couple during the last twelve (12) months. While the court does not condone any attempt to thwart parenting time or to denigrate another parent in the eyes of a child, what has occurred in this case is at least explainable. Petitioner acknowledges as much in his regret over the timing of his decisions.

---

[2] From the evidenced presented during the hearing, it became clear petitioner was not completely forthcoming in his testimony to the court during the final hearing on the petition for dissolution.

9. A voluminous amount of text messaging and other internet communications were introduced during the hearing. A number of messages were filled with vitriol, pain, anger and threats. It is noteworthy, however, that a number of communications were not. Indeed, they contained communication you would not expect between two parties navigating their way through the initial stages of a divorce, custody and support issues. Each side can with equal force pick out messages in support of their own testimony and in opposition to the other's.

10. Respondent did not deny any of the communications entered into evidence. She explained the regretful ones were fueled by anger, hurt, uncertainty and a desire to protect her son. She also testified that she is fully willing to comply with all court orders regarding custody and parenting time. The court finds these statements credible. Time will tell if faith in respondent's word is justified.

Having reviewed the testimony and evidence, having observed the witnesses while testifying, and considering all of this in light of the factors set forth in I.C. § 31-17-2-8,

It is hereby ordered:

1. It is in the best interest of the child that mother, Karen (Searing) Vivas, have primary physical custody of the parties' son, [C.S.]. The same is ordered hereby. The parties shall have joint legal custody.

2. Mother shall surrender to Father, for safekeeping, both passports for the minor child. Said passports may be used for travel, and petitioner shall fully cooperate in transferring the same upon reasonable notice. The passports are ordered returned to petitioner at the end of any such travel.

3. Father is awarded Parenting Time under the Indiana Parenting Time Guidelines where distance is a factor, with the exception that the Court is ordering the guidelines for children of five (5) years of age and older to take effect immediately given the child's ability to travel well and the little contact between father and son over the last year. Specifically, Father shall [sic] seven (7) weeks

starting this summer. He shall, within ten (10) days of this order, notify respondent of his selection of dates. If no such selection is made, respondent shall make the section (the regular April 1st deadline shall hereinafter apply). Father shall also have seven (7) days of the school winter vacation period, plus the entire spring break, including both weekends if applicable. The parties shall equally split the cost of transporting the child to and from California for Parenting Time.

4. In addition, Mother is ordered to continue making the child available for Skype with Father every Saturday afternoon, or as otherwise agreed to by the parties, but no less than one time per week.

5. Father is ordered to pay Child Support in the amount of One Hundred Eight Dollars ($108.00) per week. Father is to keep health insurance on the child, and mother is ordered to cooperate fully in finalizing that coverage. Uninsured health insurance expenses are divided per the Child Support Obligation Worksheet attached hereto and incorporated by reference. Counsel for the parties and the State of Indiana shall cooperate in effecting an appropriate Income Withholding Order.

6. Mother shall claim the child as an exemption on her 2014 tax returns, and every even year thereafter. Father shall claim the child as an exemption on his 2015 tax returns and every odd year thereafter so long as he is current, per statute, with his Child Support obligation.

7. The parties are ordered to read all of the Indiana Parenting Time Guidelines and to work diligently to effect both the letter and spirit of the same when it comes to decision affecting their son. The child's well-being and adjustment will be greatly enhanced by this effort. Neither party shall make derogatory remarks about the other in front of the child, and Mother is admonished to use better judgment about information she shares with the child about the issues herein. These matter are left to the adults to resolve and work through. It is not the burden, or responsibility, of the child.

Appellant's App. pp. 20-23 (footnote in original).

# Discussion and Decision

Father contends that the trial court's award of primary physical custody to Mother is clearly erroneous and that it is in C.S.'s best interest that Father have primary physical custody. Father argues that the trial court's findings of fact are not supported by the evidence and that the trial court's judgment is unsupported by its findings.

# Standard of Review

"Child custody determinations fall squarely within the discretion of the divorce court and will not be disturbed except for an abuse of discretion." *Aylward v. Aylward*, 592 N.E.2d 1247, 1250 (Ind. Ct. App. 1992). Where, as here, the trial court issues findings and conclusions pursuant to Indiana Trial Rule 52(A), our standard of review is two-tiered.

> First, we determine whether the evidence supports the findings, and second whether the findings support the judgment. The trial court's findings and conclusions will be set aside only if they are clearly erroneous. In reviewing the trial court's entry of special findings, we neither reweigh the evidence nor reassess the credibility of the witnesses. Rather we must accept the ultimate facts as stated by the trial court if there is evidence to sustain them.

*Stonger v. Sorrell*, 776 N.E.2d 353, 358 (Ind. 2002) (citations omitted).

We note that Mother has not filed an appellee's brief. In such circumstances, we do not undertake the burden of developing arguments for the appellee. *Maser v. Hicks*, 809 N.E.2d 429, 432 (Ind. Ct. App. 2004). When an appellee does not file a brief, we apply a less stringent standard of review and may reverse the trial court when the appellant establishes prima facie error. *Id*. "Prima facie" is defined as "at first sight, on first appearance, or on the face of it." *Id*. (quoting *Parkhurst v. Van Winkle*, 786 N.E.2d 1159, 1160 (Ind. Ct. App. 2003).

## I. Trial Court's Findings of Fact

Father specifically challenges eight of the ten findings of fact outlined in the trial court's order.[3] We address the findings which we find dispositive.

> 8. Divorce under the best of circumstances, especially when children are involved, is difficult at best. Add to the mix that respondent is from another country, from a different culture, and that petitioner chose to reveal his intent to divorce by telephone during his wife's vacation out of the country, and you have the perfect recipe for the disaster which befell this couple during the last twelve (12) months. While the court does not condone any attempt to thwart parenting time or to denigrate another parent in the eyes of a child, what has occurred in this case is at least explainable. Petitioner acknowledges as much in his regret over the timing of his decisions.
>
> 9. A voluminous amount of text messaging and other internet communications were introduced during the hearing. A number

---

[3] Father does not challenge Findings 1 and 6.

of messages were filled with vitriol, pain, anger and threats. It is noteworthy, however, that a number of communications were not. Indeed, they contained communication you would not expect between two parties navigating their way through the initial stages of a divorce, custody and support issues. Each side can with equal force pick out messages in support of their own testimony and in opposition to the other's.

10. Respondent did not deny any of the communications entered into evidence. She explained the regretful ones were fueled by anger, hurt, uncertainty and a desire to protect her son. She also testified that she is fully willing to comply with all court orders regarding custody and parenting time. The court finds these statements credible. Time will tell if faith in respondent's word is justified.

Appellant's App. p. 21. Father argues that Mother's nationality is irrelevant and that the trial court is essentially rationalizing and condoning Mother's deleterious behavior by awarding Mother custody despite her alleged efforts to alienate C.S. from father. Father claims that the trial court "ignored that all of the communications that can reasonably be described as having contained vitriol, anger and threats were from Mother to Father." Appellant's Br. p. 27. We agree.

[17] We fail to see how being from a different culture in any way justifies or explains Mother's attempts to thwart parenting time or denigrate Father to C.S. Similarly, although Father may regret the timing of his decision to reveal his desire to divorce Mother while she was in the Philippines, Mother's resulting poor emotional state does not lessen the severity of her yearlong alienation of C.S. from Father. The trial court found that both Mother and Father sent

accusatory messages, made regrettable choices, and could "with equal force" pick out evidence supporting their own testimony. However, a thorough review of the messages exchanged between the parties overwhelmingly, if not entirely, supports Father's arguments regarding (1) Mother's alienation of the child from Father by disparaging Father and preventing communication with C.S., (2) Father's monetary support of Mother and C.S., (3) Mother's repeated dishonesty to Father and to the trial court, (4) indications that Mother has been emotionally unstable, and (5) evidence that C.S.'s time with Mother in the past year has had a detrimental effect on C.S. both mentally and physically. Accordingly, we find that the trial court's findings are unsupported by the evidence.

# II. Trial Court's Conclusions of Law

[18] Indiana Code section 31-17-2-8 requires that a court must enter a custody order consistent with the best interests of the child and consider the following factors:

> (1) The age and sex of the child.
>
> (2) The wishes of the child's parent or parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>
> (4) The interaction and interrelationship of the child with:
>
>> (A) the child's parent or parents;
>>
>> (B) the child's sibling; and
>>
>> (C) any other person who may significantly affect the child's best interests.
>
> (5) The child's adjustment to the child's:

> (A) home;
>
> (B) school; and
>
> (C) community.
>
> (6) The mental and physical health of all individuals involved.
>
> (7) Evidence of a pattern of domestic or family violence by either parent.
>
> (8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 8.5(b) of this chapter.

Additionally, this court has often noted that stability and permanency is of significant importance for children. *H.G. v. Ind. Dep't of Child Servs.*, 959 N.E.2d 272, 293 (Ind. Ct. App. 2011) ("A child's need for stability is of great importance."); *Haley v. Haley*, 771 N.E.2d 743, 747 (Ind. Ct. App. 2002) ("as a general proposition, stability and permanence are considered best for the child.").

[19] Father argues first that "the [trial] court did not do a best interest analysis regarding the custody of [C.S.]." Appellant's Br. p. 30. However, the trial court's order specifically states that it did consider the statutory factors. "Having reviewed the testimony and evidence, having observed the witnesses while testifying, and considering all of this in light of the factors set forth in I.C. § 31-17-2-8, it is hereby ordered…." Appellant's App. pp. 20-21. The trial court did not make specific findings on each factor; however, the trial court is not required to do so unless requested to do so by one of the parties. *Hegerfeld v. Hegerfeld*, 555 N.E.2d 853, 856 (Ind. Ct. App. 1990).

Father also contends that it is in C.S.'s best interest that Father have primary physical custody and that the trial court's determination to the contrary is clearly erroneous. We agree.

## 1. Age and Sex of the Child

Although neither C.S.'s age nor gender are of particular importance in the best interest analysis, we note that Mother's frequent travelling with C.S. may be detrimental considering his young age. Mother testified that in the eight months prior to the hearing, she and C.S. had traveled to the Philippines, Hong Kong, Texas, Michigan, California, Las Vegas, and Singapore and that they lived for an extended period in at least four different places—Texas, Michigan, California, and the Philippines—during that time. C.S. was three and four years old during this period. Permanence and stability are of particular importance at such a young age and it appears Mother has provided little stability for C.S. in the year she has had custody. *See generally J.K.C. v. Fountain Cty. Dep't of Pub. Welfare*, 470 N.E.2d 88, 93 (Ind. Ct. App. 1984) (noting that permanence and stability are particularly important for children approaching school age).

## 2. The Wishes of the Child's Parents

Both Father and Mother requested primary physical custody of C.S. However, Mother at several points in the year prior to the final hearing stated that she was unable to take care of C.S. and thought C.S. would be better off somewhere else. In April of 2014, Mother asked Father to take C.S., however, she changed

her mind after Father sent her money for airfare to return to the United States. In November of 2014, Mother told Father that she thought it would be best for C.S. to live with her family in the Philippines while Mother stayed in California despite the fact that Father offered to take C.S.

### 3. The Wishes of the Child

[23] There is no indication in the record of the child's preference regarding primary placement.

### 4. The Interaction and Interrelationship of the Child with Others

[24] The record suggests that C.S. has a positive relationship with both parents. C.S.'s relationship with Father may have been strained during 2014 due to Mother blocking communication between Father and C.S, preventing Father from seeing C.S., and disparaging Father to C.S.

[25] Much of Father's family lives near Father in Terre Haute, has been actively involved in C.S.'s life, and has a good relationship with C.S. Father's sister, Amanda Sanders, travelled with Father to pick up C.S. from California and testified that it's been "amazing" for the family to have C.S. back. Tr. Vol. 4, p. 84. Sanders and Father's sister-in-law, Vickie Searing, testified that C.S. was very happy while back with Father in the weeks prior to the final hearing. Since divorcing Mother, Father has remarried and has had a child with his new wife.

As of the final hearing, Mother was living in California with friends. Mother's boyfriend, Jon, helps take care of C.S., helps support Mother and C.S and, according to Mother, has a good relationship with C.S.

## 5. The Child's Adjustment to the Child's Home, School, and Community

According to Mother, C.S. was getting ready to start pre-kindergarten classes at the time of the May 2015 hearing. Based on his young age and frequently changing living situation, there is little indication of how he has adjusted to his current home and community.

## 6. The Mental and Physical Health of all Individuals Involved

C.S. has dealt with physical and mental health issues. According to Mother, C.S. developed emotional issues in the year preceding the May 2015 hearing, while in Mother's care. Mother testified that C.S. was scheduled to begin attending a therapeutic school in California in the summer of 2015 because he is "emotional and violent." Tr. Vol. 4, pp. 119-120. Mother also stated that C.S. would suffer emotional outbursts in response to Mother becoming upset about domestic and legal issues with Father.

Mother frequently told C.S. information about Mother and Father's domestic and legal issues which upset C.S. In a text message, Mother states that her boyfriend "[was] surprised how much knowledge [C.S.] has about the divorce." Tr. Vol. 4, p. 58. During a skype session between Father and C.S., Mother told C.S. that "he had to talk to [Father] or [Father] was going to put her in jail." Tr.

Vol. 4, p. 56. Mother testified that she did not think it was inappropriate to tell C.S. such things. On one occasion, C.S. asked Mother why she was crying, and Mother responded that it was because she "was scared he was going to live with his dad." Tr. Vol. 4, p. 128. Mother often commented that Father abandoned her and C.S. and that C.S. did not need Father in his life and was better off without him. Mother stated she "would try and hide [C.S.]" and that she told [C.S.] that Father was trying to take him from her. Tr. Vol. 4, p. 64. Mother stated that she prevented Father from speaking to C.S. because C.S. would "flare up and be violent" after Skyping or speaking to Father because he wished to see Father or speak to him more. Tr. Vol. 4, p. 112.

[30] C.S. also had physical issues while in Mother's custody. In April of 2014, while in the Philippines, C.S. developed a severe rash and blisters over a large area of his buttocks. Upon being returned to Father a year later in April 2015, Father took C.S. to the doctor where he was diagnosed and treated for scabies. C.S. has significant scarring from the untreated scabies and Mother testified that he's embarrassed by the scars. It appears that Mother had taken C.S. to the doctor to be treated but did not follow up with treatment.

[31] Father offered to help pay for C.S.'s medications and had previously requested that Mother allow him to put C.S. on his medical insurance but Mother denied Father's request because Mother did not want Father to be able to claim C.S. on his taxes. On November 23, 2014, Father and Mother exchanged the following texts:

Father: I'm going to need [C.S.'s] social. I should have a job with insurance soon I need it to put him on it. I might need the address to[,] I'll let you know when I find out.

Mother: I'm not letting you claim him on taxes[,] im filing my own and im claiming him on it. For now im not giving his social. I should get my insurance too soon. So I can just put him on it eventually. I should get my transfer at work soon….

Petitioner's Ex. 1. Father did obtain a new job the following week which provided medical benefits to dependents. Mother was terminated from the job she held at Meijer shortly after the time of these texts.

[32] The record also suggests that Mother has had her own emotional issues. Messages from Mother reveal that she has had frequent and severe emotional outbursts and mood swings, has made threats to Father, and frequently fabricates stories. Several times, Mother told Father and Father's sister that she wanted to commit suicide. Mother also told Father of an instance when she attempted suicide and was in a coma, which she later admitted was a lie. Mother told Father that she had a friend talk to the trial court judge which she admitted was a lie and which she said in order "to scare [Father]." Tr. Vol. 4, p. 136. Mother repeatedly told Father, and represented to the court, that she was a Delta Airlines employee and could obtain free flight passes for herself, C.S., or Father. Mother admitted that this was a lie. Mother attempted to have the divorce set aside because she claimed she was not served and did not know about the proceedings. However, the trial court determined that this was a lie based on a text message sent by Mother indicating that she had a friend check

the docket and that she knew, prior to the initial hearing, that Father filed for divorce *pro se*.

## 7. Evidence of a Pattern of Domestic or Family Violence by Either Parent

[33] There were unsubstantiated allegations of domestic violence made by both parties against one another. Father denied the allegations and Mother was not questioned regarding Father's allegations against her. Father's two witnesses, Sanders and Searing, denied any knowledge of domestic abuse.

## 8. Evidence that the Child has Been Cared for by a De Facto Custodian

[34] There is no evidence that C.S. has been cared for by a de facto custodian.

## 9. Additional Considerations

[35] As we stated above, permanency is of significant importance in considering the best interests of a child. *Haley*, 771 N.E.2d at 747. As of the hearing, Mother was living with friends rent-free and paying only for utilities. In the year prior to the hearing, Mother had lived in four different cities, apparently staying with friends and family in each city. Father has remarried and lives in Terre Haute with his wife and son. Father also has a large extended family in Terre Haute that are available to watch C.S. if need be. In terms of stability, it seems clear that Father is much better equipped than Mother to provide C.S. with a stable and permanent home environment.

[36]    The trial court in this case was making an initial custody determination. At an initial determination of child custody, the trial court is concerned only with the best interests of the child and there is no presumption in favor of either parent. Ind. Code § 31-17-2-8; *Spoor v. Spoor*, 641 N.E.2d 1282 (Ind. Ct. App. 1994). The best interest analysis overwhelmingly suggests that placement with Father is in the best interest of the child. Mother has demonstrated that she is emotionally unstable, has provided C.S. with little consistency in his living situation, has threatened to leave the country with C.S. permanently to avoid the court's jurisdiction, shares inappropriate personal and legal information with the child, and does not acknowledge the potential deleterious effects her actions may have on C.S, choosing instead to blame Father for C.S.'s emotional issues. Furthermore, Mother failed to provide adequate medical treatment for C.S.'s scabies for a year resulting in significant scarring.

[37]    We acknowledge that the trial court found that Mother was credible when she stated that she would comply with future court orders regarding parenting time. Judging the credibility of witnesses is the trial court's purview and we do not disturb such determinations on appeal. *Dallas v. Cessna*, 968 N.E.2d 291, 296 (Ind. Ct. App. 2012). However, a promise to comply in the future does not provide Mother with a free pass for her yearlong attempts to impede Father from seeing his son and otherwise disparaging Father to C.S. It appears that the trial court essentially ignored or justified much of Mother's vindictive behavior. Although generally regrettable, this behavior is particularly troubling due to the detrimental effect it seems to have had on C.S.

[38] Additionally, despite the trial court crediting Mother's promise to comply with its orders, it appears that the trial court had reservations about this decision. The trial court seemed to acknowledge that Mother may be a flight risk due to the fact that Mother previously kept C.S. for an extended period in the Philippines and made multiple threats to take C.S. back to the Philippines to avoid the court's jurisdiction. Accordingly, the trial court ordered that Father maintain possession of C.S.'s passports. The trial court also stated that "[t]ime will tell if faith in [Mother's] word is justified." Appellant's App. p. 21.

[39] Although we give the trial court significant discretion in family law matters, there is simply a complete lack of evidence which suggests that Mother is better equipped to parent the child and that it is in the best interest of the child for Mother to have primary physical custody. While there is significant evidence that Mother's actions have detrimentally affected C.S. and questions regarding her ability to provide a stable home life for C.S., there is no substantial evidence that would create any similar concerns regarding Father's ability to care for C.S. Accordingly, we find that the trial court's conclusions are clearly erroneous.

## Conclusion

[40] We find that the trial court's findings of fact are unsupported by the evidence and that the trial court's conclusions of law are clearly erroneous. Accordingly, we reverse the trial court's order granting physical custody of C.S. to Mother,

order that Father be given physical custody of C.S., and remand for recalculation of child support obligation in accordance with this decision.

[41] Reversed and remanded with instructions.

Pyle, J., concurs.

Baker, J., dissents with opinion.

Donald C. Searing,

*Appellant-Petitioner,*

v.

Karen Vivas,

*Appellee-Respondent.*

Court of Appeals Case No.
84A05-1506-DR-530

**Baker, Judge, dissenting.**

[42]     I respectfully dissent.  It is well established that in family law matters, we must give wide latitude and deference to trial court judges; there is good reason for this deference:

> we are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence, or that he should have found its preponderance or the inferences therefrom to be different from what he did.

*Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002).  In reviewing a child custody determination, which requires proof by clear and convincing evidence,

an appellate court may not impose its own view as to whether the evidence is clear and convincing but must determine, by considering only the probative evidence and reasonable inferences supporting the judgment and without weighing evidence or assessing witness credibility, whether a reasonable trier of fact could conclude that the judgment was established by clear and convincing evidence.

*In re Guardianship of B.H.*, 770 N.E.2d 283, 288 (Ind. 2002).

[43]   In this case, the trial court heard testimony from multiple witnesses and considered voluminous documentary exhibits.  While the trial court expressed concern about the manner in which Mother has behaved over the past two years, it found that her behavior was "explainable," credited her expressions of regret over her negative communications with Father, and found her promises to abide by future court orders "credible."  Appellant's App. p. 21.  The trial court also noted that, in reviewing the text messages exchanged between the parties, "[e]ach side can with equal force pick out messages in support of their own testimony and in opposition to the other's."  *Id.*  Finally, the trial court observed that "[f]rom the evidence presented during the hearing, it became clear [Father] was not completely forthcoming in his testimony to the court during the final hearing on the petition for dissolution."  *Id.* at 21 n.1.

[44]   The trial court had the opportunity to interact with the parties in person and we may not second-guess its credibility determinations.  While I may have reached a different conclusion had I been the trial judge, that is not the lens through which we must view the decision as an appellate tribunal.  I believe that our standard of review compels us to affirm in this case because sufficient evidence

and inferences support the trial court's order, and respectfully dissent from the majority decision as a result.