## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

09/12/2017, 10:17 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Daniel G. Foote
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re: The Matter of the, Involuntary Termination of the Parent-Child Relationship of C.L., a Minor Child and his Father, CH., <br><br> C.H., <br><br> *Appellant-Respondent,* <br><br> v. <br><br> Marion County Department of Child Services, | September 12, 2017 <br><br> Court of Appeals Case No. 49A02-1703-JT-566 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Marilyn Moores, Judge <br> The Honorable Larry Bradley, Magistrate <br><br> Trial Court Cause No. 49D09-1603-JT-191 |

*Appellee-Petitioner,*

and,

Child Advocates, Inc.
*Appellee (Guardian ad Litem).*

**Barnes, Judge.**

# Case Summary

C.H. ("Father") appeals the termination of his parental rights to his son, C.L. We affirm.

# Issue

Father argues that the evidence is insufficient to support the termination of his parental rights.

# Facts

C.L. was born in December 2011 to Father and A.L. ("Mother"). In April 2012, the Department of Child Services ("DCS") removed C.L. and his older sister[1] from Mother's care and filed a petition alleging that C.L. and his sister were Children in Need of Services ("CHINS"). Father did not appear at the

---

[1] Father is not the father of C.L.'s older sister.

April 19, 2012 detention hearing, and C.L. was placed in foster care. Father also did not appear at a May 2, 2012 hearing, and C.L. was placed with his maternal grandmother. Father appeared for the first time at a May 25, 2012 pretrial hearing. The trial court appointed a public defender for Father, authorized supervised parenting time with C.L., and ordered Father to establish paternity. Father also appeared at a pretrial hearing on June 15, 2012. However, Father did not appear at the CHINS fact-finding hearing on July 20, 2012. Mother admitted that the children were CHINS and admitted that she "lack[ed] independent housing and there was an incident of domestic violence between she and [Father]." Exhibits at 85. Father's counsel waived the fact-finding hearing, and the trial court found that the children were CHINS. Mother later signed voluntary consents for C.L.'s adoption.

[4] On August 17, 2012, the trial court entered a parental participation order and dispositional order, but Father did not appear for the hearing. The trial court ordered Father to contact the DCS case manager every week; keep all appointments with service providers, the case manager, and the guardian ad litem; sign all necessary releases; establish paternity; complete a parenting assessment and any recommendations; and complete a domestic violence assessment program.

[5] Father did not appear at additional hearings on November 16, 2012, February 22, 2013, May 24, 2013, August 23, 2013, and October 25, 2013. On January 31, 2014, the trial court held a permanency hearing, and the plan changed from reunification to adoption. Father also did not appear for that hearing. The trial

court noted that DCS had not been in contact with Father since July 2012. On May 9, 2014, the trial court held another periodic review hearing, and Father did not appear. On June 18, 2014, Father's counsel moved to withdraw her appearance, and the trial court granted the request. Father also did not attend child and family team meetings.

[6] On March 8, 2013, the State charged Father with Class A misdemeanor domestic battery and Class A misdemeanor battery. On March 26, 2013, Father pled guilty to misdemeanor domestic battery, and he was sentenced to one year with 339 days suspended to probation. On May 14, 2013, the State charged Father with Class A misdemeanor domestic battery, Class A misdemeanor battery, Class A misdemeanor invasion of privacy, Class D felony domestic battery, and Class D felony battery. Father pled guilty to Class A misdemeanor invasion of privacy and the remainder of the charges against him were dismissed. The trial court sentenced him to one year with 249 days suspended to probation. In March 2014, Father violated his probation and was ordered to serve his previously suspended sentence.

[7] In December 2015, the State charged Father with Level 5 felony dealing in a narcotic drug (heroin), Level 6 felony possession of a narcotic drug (heroin), Level 3 felony dealing in a narcotic drug (heroin), and Level 5 felony possession of a narcotic drug (heroin). Father pled guilty to Level 5 felony dealing in a narcotic drug, and the other charges were dismissed. The trial court sentenced Father to four years with two years suspended to probation. Father's executed sentence was to be served on work release.

[8] DCS filed a petition to terminate Father's parental rights to C.L. in February 2016, and a termination hearing was held in February 2017. At the time of the termination hearing, Father was residing at the Duvall Residential Center, and he estimated that he would be there for approximately six months. Father testified that he had not seen C.L. in "[p]robably two years." Tr. p. 27. The trial court entered findings of fact and conclusions thereon granting DCS's petition to terminate Father's parental rights. Father now appeals.

## Analysis

[9] Father challenges the termination of his parental rights to C.L. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). "Indeed the parent-child relationship is 'one of the most valued relationships in our culture.'" *Id.* (quoting *Neal v. DeKalb County Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). We recognize, of course, that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities.'" *Id.* (quoting *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

[10] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *Id.* We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)). Here, the trial court entered findings of fact and conclusions thereon in granting DCS's petition to terminate Father's parental rights. When reviewing findings of fact and conclusions thereon entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[11] Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal

> or the reasons for placement outside the home of the parents will not be remedied.

>     (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

>     (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

>     (C)    that termination is in the best interests of the child; and

>     (D)    that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992).

## I. Changed Conditions

[12] Father challenges the trial court's finding of a reasonable probability that the conditions resulting in C.L.'s removal or the reasons for placement outside Father's home will not be remedied.[2] In making this determination, the trial

---

[2] Father also argues that the trial court's conclusion that the continuation of the parent-child relationship poses a threat to the well-being of C.L. is clearly erroneous. Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive. Subsection (b)(2)(B)(iii), which concerns repeated CHINS adjudications, is inapplicable here. Consequently, DCS was required to demonstrate by clear and convincing evidence a reasonable probability that either: (1) the conditions that resulted in C.L.'s removal or the reasons for placement outside the home of the parents will not be remedied, or (2) the continuation of the parent-child relationship poses a threat to the well-being of C.L. The trial court found a reasonable probability that the conditions that resulted in C.L.'s removal and continued placement outside Father's home would not be remedied, and there is sufficient evidence in the record to support the trial court's conclusion. Thus, we need

court must judge a parent's fitness to care for his or her child at the time of the termination hearing and take into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The trial court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.*

[13] The trial court found:

> There is a reasonable probability that the conditions that resulted in [C.L.'s] removal and continued placement outside the home will not be remedied by his father. [Father] minimally participated in the CHINS matter while open for almost five years. He has not made any true effort to see his child proving his unwillingness to be an actual parent. Further, [Father's] criminal activity places reasonable doubt as to whether he would even remain available to engage in services and parent.

Appellant's App. Vol. II p. 21.

[14] Father argues that DCS failed to demonstrate that the conditions that led to C.L.'s continued placement outside Father's home would not be remedied. In his reply brief, Father contends that the conditions that led to C.L.'s removal were remedied by Mother's consent to adoption and by C.L.'s placement with his maternal grandmother.

---

not determine whether there was a reasonable probability that the continuation of the parent-child relationship poses a threat to C.L.'s well-being. *See, e.g., Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 148 n.5 (Ind. 2005); *In re T.F.*, 743 N.E.2d 766, 774 (Ind. Ct. App. 2001), *trans. denied*.

[15] Although the reasons for C.L.'s initial removal from Mother may not have related to Father, DCS demonstrated a reasonable probability that the reasons for placement outside Father's home would not be remedied. DCS presented evidence that, although the CHINS case began in April 2012 and the termination hearing was in February 2017, Father made little to no effort to parent C.L. At the time of the termination hearing, Father had not seen C.L. in at least two years, he did not participate in services ordered during the CHINS action, and he continued engaging in criminal activities during the CHINS action. Although Father was aware of the CHINS action, he did not maintain contact with DCS and did not attend hearings on the matter. The trial court's finding on this issue is not clearly erroneous.

## II. Best Interests

[16] Father challenges the trial court's finding that termination of his parental rights is in C.L.'s best interests. In determining what is in the best interests of a child, the trial court is required to look at the totality of the evidence. *D.D.*, 804 N.E.2d at 267. In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.*

[17] Father argues that the "extreme measure" of termination is not in C.L.'s best interests. Appellant's Br. p. 18. According to Father, he deserves additional time to reunify with C.L. while C.L. remains in the care of his maternal grandmother. Father relies on *In re G.Y.*, 904 N.E.2d 1257 (Ind. 2009), *In re J.M.*, 908 N.E.2d 191 (Ind. 2009), and *H.G. v. Ind. Dep't of Child Servs.*, 959 N.E.2d 272 (Ind. Ct. App. 2001), *trans. denied*, for the proposition that his

incarceration is insufficient to warrant the termination of his parental rights. In these cases, the courts concluded that termination of incarcerated parents' parental rights was not warranted because the parents were bonded with the children, were soon to be released from incarceration, were unlikely to reoffend, and demonstrated a commitment and interest in maintaining a relationship with the child. Here, however, Father is not bonded with C.L., we cannot say Father is unlikely to reoffend, and Father has not demonstrated a commitment and interest in maintaining a parental relationship with C.L. The cases cited by Father are distinguishable.

[18] DCS presented evidence that C.L. has lived with his grandmother most of his life, he is bonded with her, and he is doing well. The DCS case manager and the guardian ad litem both recommended termination of Father's parental rights. Given Father's lack of a relationship with C.L., continued criminal activity, and the fact that C.L. is doing well with his grandmother, we conclude the trial court's finding that termination is in C.L.'s best interests is not clearly erroneous.

### III. Satisfactory Plan

[19] Finally, Father also challenges the trial court's finding that there is a satisfactory plan for the care and treatment of C.L. Indiana courts have held that for a plan to be "'satisfactory,'" for the purposes of the termination statute, it "'need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated.'" *In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014) (quoting *Lang v. Starke Cnty. Office of*

*Family and Children*, 861 N.E.2d 366, 375 (Ind. Ct. App. 2007), *trans. denied*), *trans. denied*.

[20] Although Father suggests that C.L. should merely remain with his grandmother while Father has additional time to reunify, the trial court properly rejected this argument. This argument was addressed in our discussion of C.L.'s best interests and the likelihood that the conditions leading to C.L.'s placement outside of Father's home would be remedied. DCS's plan for C.L. is adoption by his grandmother, and that is a satisfactory plan. *See, e.g., Lang*, 861 N.E.2d at 375 (holding that adoption and independent living were satisfactory plans). The trial court's finding that DCS had a satisfactory plan is not clearly erroneous.

## Conclusion

[21] The evidence is sufficient to support the termination of Father's parental rights to C.L. We affirm.

[22] Affirmed.

May, J., and Bradford, J., concur.